**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Loren STERN and Frank Panno,**
**Defendants–Appellants.**

Nos. 87–2418, 87–2453.

United States Court of Appeals,
Seventh Circuit.

Argued May 19, 1988.

Decided Sept. 27, 1988.

Richard H. McLeese, Patrick Tuite, Tuite Mejia & Giacchetti, Chicago, Ill., G. Robert Blakey, Notre Dame, Ind., for defendants-appellants.

Mervyn Hamburg, Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before WOOD, Jr., and KANNE, Circuit Judges and REYNOLDS,* Senior District Judge.

KANNE, Circuit Judge.

Doris Fischer, a former stripper and one-time prostitute, began her association with Frank Stern, an entrepreneur and one-time lawyer, in 1979. Fischer met Stern when she began working at a Chicago nightclub of which he was part-owner. Although Fischer eventually left Stern's club, they did not lose contact and sometime in late 1980 or early 1981, Stern suggested to Fischer that they set up their own partnership and go into business. Stern recommended that they open a bar—a proposal rejected by Fischer. She did not drink and was dissatisfied with working in such surroundings. After some market research of her own, Fischer made a counter-proposal to Stern, suggesting they form a commercially advertised escort service. As Fischer explained to Stern, the escort service would, for a fee, provide clients with female companionship, both sexual and platonic in nature. In short, Fischer proposed that they enter into a prostitution venture. Stern agreed.

Pursuant to that agreement, Stern provided Fischer with sufficient capital to begin her operations while Fischer retained managerial control of the business. After paying for expenses (including the escorts' fees) and her salary, Fischer and Stern evenly split the remaining profit. In addition to providing start-up capital, Stern also gave legal advice as to what the escorts

---

* The Honorable John W. Reynolds, Senior District Judge for the Eastern District of Wisconsin, is sitting by designation.

could do and arranged for the installation of telephones and a call-forwarding service.

This new entry in the service market was first called "Chicago Continental," but shortly thereafter, in mid–1981, the business name was changed to "Fantasies Unlimited."[1] The escort service, based in a Chicago apartment, was advertised in two magazines, *Welcome* and *Nite Life*, with a telephone number which potential clients were invited to call. When a client telephoned, an operator recorded the customer's name, address, business address and price quoted, which ranged from $125.00 to $200.00. If a check of the client information proved satisfactory, an escort was assigned and told where to meet the client. This information, to which was added the particular method of sexual activity preferred by the client, the date on which services were performed, and the name of the escort assigned to the client, was placed on index cards and maintained in a file (later computerized).

Because Chicago had only one other advertised escort service, the business prospered, eventually employing from ten to twelve escorts. Begun in 1981, the business continued until 1986. The income for the escort service reached its peak in 1984, when Fischer recorded 4,720 transactions and receipts of $795,936.97.

In early 1981, Fischer was approached by Thomas Gervais who operated National Credit Service ("NCS"), an operation which made credit card usage available to businesses otherwise unable to obtain authorization to accept credit cards.[2] Gervais suggested that Fischer begin making credit card sales. When Fischer took the idea to Stern, he rejected it at first, but then reconsidered. A second meeting between Gervais and Fischer took place and soon thereafter customers were able to use their VISA, MasterCard or American Express cards to pay for escort services.

After about six months, Fischer ran into some problems with NCS and American Express. Charges made on American Express cards were not billed by American Express but by NCS.[3] If NCS was unable to collect, it refused to make payment to Fischer, who nonetheless paid the escorts their percentage of the charge. Thus, Fantasies Unlimited began losing money on the American Express charges.

Stern was of the opinion that the NCS–American Express problem was costing the business too much uncollected revenue. He therefore offered Fischer the use of certain business accounts he owned, through which client charges could be billed. Using two accounts made available by Stern, Fischer's phone operators began calling the credit card companies for authorization codes before accepting a charge. The procedure used to obtain an authorization code involved a Fantasies Unlimited operator calling a "1–800" number and providing the operator on the other end with Stern's merchant code and the customer's credit card number.

Fantasies Unlimited escorts also carried portable printers allowing them to accept charges on the spot. At first, NCS provided Fischer with the slips for those charges but eventually, when the business began using Stern's accounts, Stern began providing slips. Fischer testified that after the slips were filled out, she returned the MasterCard and VISA slips to Stern and mailed the American Express slips to Arizona.[4]

The business continued to grow with income increasing from $131,000.00 in 1981 to $583,317.25 in 1983. Stern continued to provide support, suggesting that escorts become independent contractors for tax purposes and laundering money for one

---

1. "Playgirls" was a spin-off operation created later.

2. Unbeknownst to Fischer, Gervais' operation, which made credit card usage available to businesses like hers by using fictitious but approved merchant names, had been discovered by the FBI. At the time Gervais approached Fischer, NCS was being run by the FBI.

3. The MasterCard and VISA charges appeared on the customers' monthly statements as regular charges.

4. Stern directed Fischer on how to fill out the American Express slips and send them to Arizona.

escort through his business. Stern was also a Fantasies Unlimited patron, enjoying a courtesy discount.

In 1983, however, Frank Panno appeared on the scene. Although Fischer previously had met Panno during her days working in clubs and occasionally had lunch with him, the two had no prior business dealings with each other. Once acquaintances had been renewed, Panno took Fischer to lunch and they met four other men, one of whom obviously was in charge. Panno had advised Fischer before the meeting to call the man in charge "sir." This unidentified man told Fischer that Stern would no longer be her partner and that Frank Panno would now see to her needs. Fischer pointed out that the telephone lines, so integral to her business, had all been installed under Stern's name. The unidentified man assured Fischer that Panno would take care of her and that he would see to it that her credit card service would continue.

Panno lived up to his end of the bargain and installed new telephone connections in a Chicago condominium owned by him.[5] This telephone hook-up forwarded calls either to the apartment of Fantasies Unlimited's manager or to Fischer's house. Telephone bills for that phone, sometimes in the thousands of dollars, were also sent to the condominium. Although no one used the condominium as a residence, it was thus integral to the successful operation of the prostitution business. For his efforts, Panno received the share of profits previously reserved for Stern, who apparently was prudent enough to leave the business without protest.

Panno also suggested that Fischer begin advertising in the *Indiana–Illinois Connection.* Described by Fischer as a "sex magazine," this magazine was distributed, as the name indicates, in both Illinois and Indiana. Panno, who owned a massage parlor/adult bookstore and was part owner of a few bars, had done some advertising in the magazine himself and thought it might bring some additional business. Fischer also entrusted Panno with a little black book of Illinois–Indiana customers.[6]

In August, 1984, operating difficulties appeared on the horizon. The FBI obtained search warrants for Fischer's residence and confiscated boxes of client cards and computerized files. Despite this fact, as indicated earlier, 1984 was the escort service's most successful year. In 1985, conditions started to deteriorate, the IRS began investigating and the FBI searched her home, Panno's condominium, and certain safety deposit boxes. Finally, following the indictment by the grand jury in 1986, Fischer was forced to close down the prostitution operation.

## THE INDICTMENT

Panno and Stern, along with five other defendants (including Fischer), were charged under 18 U.S.C. § 1962(d) with conspiring to violate 18 U.S.C. § 1962(c) which prohibits any person from being "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." More specifically, Stern and Panno were charged with conspiring to conduct or participate in the affairs of the prostitution business, directly or indirectly, through a series of predicate offenses, which in this case involved causing Fischer to "use any facility in interstate commerce, ... with intent to ... promote, manage, establish, carry on ... any unlawful activity ..." in violation of 18 U.S.C. §§ 1952 and 2(b). Put another way, Stern and Panno were charged with causing the use of an interstate facility— the telephone—with the intent to promote the prostitution business not only in violation of both 18 U.S.C. §§ 1952 and 2(b), but also in violation of § 1962(c) since those

---

**5.** Panno also referred Fischer back to NCS for credit card authorizations. Fischer continued to use NCS to obtain credit card approvals until she discovered she was using a service operated by the FBI.

**6.** These little books were never recovered after the business was raided.

offenses constituted the RICO pattern of racketeering activity.

Panno alone was charged with filing false federal income tax returns, in violation of 26 U.S.C. § 7206(1).

Fischer pled guilty to three counts of the indictment and became the government's chief witness against several co-defendants, including her partners Loren Stern and Frank Panno.

Both Stern and Panno were convicted of all counts with which they were charged. Stern was sentenced to three years imprisonment plus five years probation, fined $40,000.00, and required to forfeit $108,870.50. Panno was sentenced to four years imprisonment and followed by five years probation, fined $40,000.00, and ordered to forfeit $250,690.50 and his condominium.

## THE APPEAL

### 1. *Burden of Proof*

The district court's jury instructions pertaining to the Travel Act stated, "it is *not required* that the government prove that a defendant *knew or reasonably foresaw the use of an interstate facility* as long as you find ... that he used or caused such use to further prostitution" (emphasis added). Despite this unmistakably clear language, Stern and Panno argue that the government had an enhanced burden to prove that they "knowingly" caused the use of an interstate facility to further prostitution. Both defendants claim that the government failed to meet this enhanced burden of proof. Further, because the Travel Act offenses were the predicate acts underlying the RICO count, it is claimed that the government also failed to meet its burden on the RICO counts.

We turn now to the burden of proof argument put forth by Stern. He maintains that the language of the jury instructions on the RICO count, the language of the defendant's theory-of-defense instruc-

tion, the Travel Act instructions, and the indictment creates the "law of the case" which required the government to prove that a defendant knowingly caused the use of an interstate facility.[7] The jury instruction primarily relied on by Stern in advancing this theory relates to the RICO conspiracy count and states:

> Each defendant is charged in Count 1 of the indictment with conspiracy to conduct the affairs of an enterprise through a pattern of racketeering activity. To sustain that charge, with respect to each defendant, the government must prove the following propositions:
>
> First, that Frank Panno, Doris Fischer, Loren Stern, Cari Krame, Scott Kramer and Marla Cohen constituted an enterprise consisting of a group of individuals associated in fact for the purpose of carrying on a business activity involving prostitution;
>
> Second, that the particular defendant was employed by or associated with that enterprise;
>
> Third, that the defendant knowingly conspired to conduct or participate in the conduct of the affairs of the enterprise, directly or indirectly, through a pattern of racketeering activity, namely through acts utilizing the interstate telephone lines to secure authorization for credit cards and advertising in an out-of-state publication, in order to facilitate the carrying on of business enterprise involving prostitution in violation of Illinois law, as alleged in Counts 2 through 18 of the indictment; and
>
> Fourth, the enterprise engaged in interstate commerce or the activities of the enterprise affected interstate commerce.
>
> If you find from your consideration of all the evidence as to a particular defendant that each of these propositions has been proved beyond a reasonable doubt, you

7. On its face, the theory-of-defense instruction creates no enhanced burden of proof which the government was required to meet. The instruction merely reiterated their claim that they did not know interstate facilities would be used, a fact which is irrelevant—as discussed herein. Nor, as we discuss later in this opinion, did statutory law, as set forth in the indictment, require that Stern or Panno knowingly cause the use of interstate facilities to further the prostitution operation.

should find that defendant guilty in Count 1.

If, on the other hand, you find from your consideration of all the evidence as to a particular defendant that any one of these propositions has not been proved beyond a reasonable doubt, you should find that defendant not guilty on Count 1.

(Transcript pp. 3330–3331.) In the foregoing instruction Stern focuses on the third enumerated paragraph. According to Stern, certain of the phrases between the words "knowingly" and "acts utilizing the interstate telephone lines" in the instruction, had no real meaning and can, therefore, be eliminated. Thus, "knowingly" must be read to modify the acts of using the telephone and not the word "conspiring." Under this theory, the government had the burden, consistent with the "law of the case" enunciated in the instruction, of proving that defendant's objective was to "knowingly conduct the affairs of an enterprise by utilizing interstate facilities,"— and, simplifying it even further, to "knowingly utilize an interstate facility."

Both Stern and Panno argue that there was no evidence that they *knew* Fischer or her operators would make interstate telephone calls in furtherance of the illegal business. Nor, it is contended, is there evidence that Panno knowingly caused Fischer to advertise interstate in the *Indiana–Illinois Connection.*

■ Stern's law-of-the-case theory regarding a changed burden of proof is a fantasy. It is unmistakable that the court's instructions did not require the government to prove that Stern and Panno *knew* Fischer would use interstate facilities. As we will discuss shortly, the law in this circuit requires only that an accomplice to a Travel Act violation intend that the illegal activity described in the Travel Act (here prostitution) be carried out.

■ In reality, the government's statutory burden was not altered, in any way, by the language of the court's RICO instruction. The semantic gamesmanship regarding the instructions fails on an application of common sense. The RICO instruction, read sensibly and in conjunction with the other instructions, only required the jury to find that the defendants "knowingly conspired" and, as part of that conspiracy, caused the use of interstate facilities. That is, the government was required by the instructions to prove only a defendant's *knowing participation in the conspiracy,* the object of which was to operate an enterprise, affecting interstate commerce, through two predicate acts. The instruction does not require that the jury find that Stern and Panno knowingly used an interstate facility to further the enterprise. See *United States v. O'Malley,* 796 F.2d 891 (7th Cir.1986) (approving a similar jury instruction).

■ Aside from an interpretation of the instructions in the context within which they were given, those instructions were consistent with the controlling law. As we explained in *United States v. Neapolitan,* 791 F.2d 489 (7th Cir.), *cert. denied,* 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986):

Section 1962(d) explicitly prohibits conspiracies to violate RICO. The natural reading of that phrase *is the proscription of any agreement* the object of which is the conducting of or participation in the affairs of an enterprise through a pattern of racketeering activity.

*Id.* at 497 (emphasis added). Our decision in *Neapolitan* was based on an analysis of the RICO conspiracy provision by the Eleventh Circuit Court of Appeals in *United States v. Carter,* 721 F.2d 1514 (11th Cir.), *cert. denied sub nom. Morris v. United States,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984). There, the court said:

A natural reading of the [RICO conspiracy provision] is that "through a pattern of racketeering activity" modifies ... "the conduct of the enterprises affairs," rather than ... "conspiring to conduct or participate."

721 F.2d at 1529 n. 22. Thus, we held a "defendant need only agree that he and his co-conspirators will operate an enterprise through the commission of two predicate

acts." *Neapolitan*, 791 F.2d at 496. The RICO conspiracy provision does not require that a defendant agree personally to commit two acts of racketeering activity.

As to the Travel Act, in *United States v. Markowski*, 772 F.2d 358 (7th Cir.1985), *cert. denied*, 475 U.S. 1018, 106 S.Ct. 1202, 89 L.Ed.2d 316 (1986), we explained:

> The intent element of the Travel Act applies to the *purpose* of the travel. The defendant must intend that the travel promote or carry on an unlawful activity.

772 F.2d at 365 (emphasis added). Moreover, "[c]onvictions under 18 U.S.C. § 1952 do not require that the defendant knowingly cause or reasonably foresee interstate travel or use of an interstate facility. *United States v. McPartlin*, 595 F.2d 1321, 1361 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *United States v. Craig*, 573 F.2d 455, 489 (7th Cir.1977), *cert. denied*, 439 U.S. 820, 99 S.Ct. 83, 58 L.Ed.2d 110 (1978); ...." *United States v. Raineri*, 670 F.2d 702, 716 n. 12 (7th Cir.), *cert. denied*, 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982). Finally, "[t]he benefit sought or gained from the interstate travel or use need not be essential to the illegal activity. It need only hold the promise of facilitating that activity." *Id.* at 717 (citations omitted). The government was simply required to show, and did show, that Stern and Panno ultimately "caused" the use of such interstate facilities—not that they knew interstate facilities were being used.

■ Stern advances an additional theory based on the fact that Stern and Panno were charged as accomplices in the Travel Act counts under 18 U.S.C. § 2(b). It is claimed that the burden of proof for the Travel Act counts was altered by the allegation that Stern (and Panno) acted in violation of § 2(b). The relevant part of the accomplice statute states, "whoever wilfully causes an act to be done which if directly performed by him ... would be an offense against the United States, is punishable as a principal." The argument is that the term "wilfully" in § 2(b) imposes a requirement on the government to show that a defendant knowingly caused an act to be done, in this case the interstate use of telephones or a magazine, in violation of the Travel Act. In order to knowingly cause a violation of the Travel Act, it is contended that the government was required to show that Stern (and Panno) knew such interstate facilities were being used.

This theory is also flawed. Under § 2(b), it is illegal to cause someone else to do what if done personally would be a violation of federal law. Thus, an accomplice under § 2(b)—one who causes an illegal act to be done—stands in the shoes of the actor. In this case, if Stern or Panno caused the use of an interstate facility to further the prostitution business, they are treated as if they themselves had used an interstate facility to further the prostitution business. Since, as we have already said, it is not necessary that the person who uses an interstate facility to further an illegal business *know* such a facility operates interstate, it follows that an accomplice, standing in the shoes of such an actor, need not have knowledge of the interstate character of the facility used.

In *United States v. Markowski*, we approved an instruction defining "wilfully" in section 2(b) as an "act committed voluntarily and purposely, with a specific intent to do something the law forbids; that is to say, with *a bad purpose* ..." 772 F.2d at 364 (emphasis added). In this case, the specific intent required by section 2(b) was wilfully to cause the use of telephones or a magazine in promoting a prostitution operation—not wilfully to cause interstate use of those facilities. That Stern and Panno did not specifically intend or know that the illegal acts (promoting prostitution by telephone and magazine) would involve a violation of federal law (use of interstate facilities involving prostitution) is irrelevant.

### 2. *Sufficiency of the Evidence*

Stern and Panno's main thrust with regard to the sufficiency of the evidence is their claim that there was insufficient evidence that they caused the use of interstate facilities in furtherance of prostitution.

■ First, we note that our review of the record causes us to conclude that there was more than sufficient evidence of defendants' agreement to participate in an enterprise involving prostitution, which affected interstate commerce in violation of the RICO conspiracy provision. In addition, we believe that there was clearly sufficient evidence that the defendants, as accomplices, each caused the use of an interstate facility with the purpose of promoting prostitution in violation of the Travel Act.

The evidence disclosed that Stern approved Fischer's use of the NCS telephone number to obtain credit card authorizations. Without his approval, it is clear Fischer could not have proceeded since Stern controlled the business purse strings. Later, Stern permitted Fischer to use his legitimate business accounts to obtain credit card authorizations for escort service charges.

As we discussed earlier, whether Stern *knew* that Fischer's use of his business accounts would involve interstate telephone calls is irrelevant. They did. Telephone calls dealing with credit card charge authorizations for VISA, MasterCard, and American Express were made from Illinois to Ohio, Missouri, Arizona, Nebraska, and California. (Trial Transcript pp. 514–538). That such calls were made is all that matters. What is relevant is that Stern provided Fischer with his approval, his backing, and ultimately his legitimate merchant account numbers with the intent to facilitate the prostitution business. Stern does not claim otherwise. Thus, Stern's convictions as an accomplice in violation of the Travel Act stand, both in their own right and as predicate offenses under the RICO count.

■ Similarly, Panno's claim regarding the sufficiency of the evidence is without merit. Panno took Stern's place in every capacity. Fischer was told Panno would provide her with all she needed and that Stern was out. Indeed, Panno provided her with the NCS number so that Fischer could again obtain credit card authorizations. Panno also suggested that Fischer advertise in the *Indiana–Illinois Connection,* a magazine which, according to Fischer's tes-timony, crossed state lines. (Trial Transcript p. 1918).

Panno makes much of the fact that he did not direct Fischer to advertise in the magazine and, therefore, did not *cause* her to do so. Given the circumstances surrounding his suggestion to her, however, the jury reasonably could have found that Panno did cause Fischer to use the magazine. Panno had become associated with the prostitution operation under, what can fairly be described as, ominous circumstances. Panno was put into place by a mysterious figure with whom neither Stern nor Fischer felt comfortable arguing. As a result, Panno exerted ultimate control over the prostitution business. Thus, when Fischer asked whether she should advertise in the *Indiana–Illinois Connection* and Panno replied that she should try it to see if it might help business, Fischer could easily have regarded this as a directive. We find that Panno's convictions under RICO and as an accomplice to the Travel Act violations are supported by sufficient evidence.

### 3. *Motion to Suppress*

Stern also argues that the district court erred in its denial of his motion to suppress statements he made to IRS agents concerning his connection with Fischer.

On June 17, 1985, Fischer's business was searched by FBI agents. The agents searched Fischer and Panno's safety deposit boxes, the apartment used as the business' office, and Panno's condominium through which calls were being forwarded. The business continued to operate, however, until March, 1986, when Fischer was indicted.

Shortly after the FBI conducted its search, two IRS agents met with Stern and asked him about his association with Fischer. Stern revealed a number of things, including the fact that Fischer's escort service was a prostitution business, that he allowed Fischer to process credit card charges through his accounts, and that he derived income from the credit card slips. Stern denied being Fischer's partner.

Before trial, Stern filed a motion to suppress his statement to the IRS agents because he claimed he had been misled into making it. According to Stern, the two agents told him that he was not a target of their investigation and asked whether he would give a statement. However, Stern contends the IRS agents failed to disclose the existence of the FBI's simultaneous on-going investigations, under which Stern was considered a potential co-conspirator. Had he known of the FBI investigation, Stern contends he would never have agreed to speak with the IRS. The district court denied Stern's motion to suppress, ruling that even if the IRS agents' failure to mention the FBI probe could have been considered a misrepresentation, it was not so material as to render Stern's statements involuntary.

We agree with the district court. Prior to his meeting with the IRS agents, Stern was informed that a subpoena for all his business records had been issued and that an IRS agent would serve that subpoena. Two IRS agents, who identified themselves with credentials and told Stern they were investigating Fischer's taxes, then appeared. They informed Stern that he was not a target of *their* investigation. Stern was then asked whether he would answer questions and agreed to do so—giving the statement he ultimately sought to suppress.

At the time of the hearing on the motion to suppress, Stern admitted that he had been a state prosecuting attorney in Illinois and that he was aware of his rights. The district court found that Stern was well aware of what he was doing and that he could have anticipated some of the consequences of his statements. Thus, whether the IRS agents told him of the FBI probe or not would not have affected his decision to talk to the IRS agents.

As the government points out, Stern had the burden of proving, by clear and convincing evidence, first that the IRS agents affirmatively misled him as to the nature of their investigation and second, that their actions were material to his decision to talk

with them. *United States v. Serlin,* 707 F.2d 953, 956 (7th Cir.1983).

The IRS agents did not mislead Stern about the nature of their investigation. They truthfully told Stern that he was not a target of their investigation. In *Serlin,* we said, "Simple failure to inform defendant that he was the subject of the investigation ... does not amount to affirmative deceit unless defendant inquired about the nature of the investigation....." *Id.* at 956. We are not prepared to hold that one agency's failure to mention another agency's investigation (especially where no questions about any other agency were asked) constitutes an affirmative misrepresentation.

### 4. *Severance*

Both Stern and Panno make various claims about the joinder of particular defendants and counts in the trial of this case.

At the commencement of the trial only three of the seven original defendants named in the indictment remained to be prosecuted. In addition to Stern and Panno, Marla Cohen had been charged in the RICO conspiracy counts. Panno claims that the government in fact alleged two separate conspiracies, one involving Stern and the other involving himself. Little time need be spent on this issue. The prostitution enterprise was on-going and Stern's replacement by panel did not cause the termination of one conspiracy and the commencement of another. The substitution of players by "sir" did not alter the continuing nature of the single conspiracy. *United States v. Lynch,* 699 F.2d 839, 843 (7th Cir.1982).

In mid-trial, Cohen's case was dropped, leaving only Stern and Panno as defendants. Stern claims that his case was irreparably damaged by the admission of evidence against Cohen which was not admissible against him. Panno makes a similar claim. Neither have any mérit. The court gave proper limiting instructions during the trial and at the close of the evidence admonished the jury to consider each

count and each defendant separately. Moreover, the jury was told by the court that it was required to omit consideration of any evidence admitted solely against another defendant. We make the crucial and valid assumption that jurors carefully follow instructions given them by the court. *Francis v. Franklin*, 471 U.S. 307, 324 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985); *Evans v. Young*, 854 F.2d 1081, 1084 (7th Cir.1988). There is no indication that the joinder of the various counts of the defendants resulted in prejudice to Stern or Panno. Reversible error occurs only when a defendant can demonstrate a substantial and injurious effect or influence on the jury's verdict. *United States v. Lane*, 474 U.S. 438, 449, 106 S.Ct. 725, 732, 88 L.Ed.2d 814 (1986).

### 5. *Forfeiture*

Finally, Panno challenges the forfeiture of his condominium under the RICO forfeiture provision. Panno claims that because only the telephone jacks in his condominium were used to further the Fischer business, his whole interest in the condominium should not have been ordered forfeited.

However, the condominium was never used for any legitimate purpose. It stood empty for use as a telephone call transfer location and mail drop. Therefore, the forfeiture of the entire condominium was not *grossly* disproportionate to the offense committed. *Cf. United States v. Horak*, 833 F.2d 1235, 1251 (7th Cir.1987). This is especially true in view of the importance the condominium played in the prostitution enterprise. The call-forwarding procedure, involving the use of telephones in one place and the receipt of those calls in another, was instrumental to the successful operation of the escort business and was designed to thwart police raids which had plagued the operation.

Under the RICO forfeiture statute, 18 U.S.C. § 1963(a)(2)(D),[8] where a RICO par-

ticipant's property is "used by him to further the affairs of a RICO enterprise" or where that property affords the person a source of influence over the enterprise, that property is subject to forfeiture. *United States v. Zielie*, 734 F.2d 1447, 1459 (11th Cir.1984); 18 U.S.C. § 1963(a)(2)(D). Given the importance of Panno's condominium to the continuing successful operation of the enterprise which concerned prostitution business, we find the forfeiture of Panno's entire condominium (as opposed to just the telephone jack and the mail box) was appropriate.

For the reasons stated, the convictions of Frank Panno and Loren Stern, and the forfeiture of Frank Panno's interest in the condominium, are AFFIRMED.

---

**8.** In its relevant part, 18 U.S.C. § 1963(a), of the RICO Act as revised in 1984, calls for the forfeiture of:

    (a)(2)(D) any ... property ... of any kind affording a source of influence over; any en-

terprise which the person has ... operated, controlled, conducted, or participated in the conduct of in violation of Section 1962.