**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Sidney MUSKOVSKY and Michael**
**Posner, Defendants–Appellants.**

Nos. 87–3103, 87–3104.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 15, 1988.

Decided Dec. 8, 1988.

Michael B. Brohman, Jenner & Block, Chicago, Allan Ackerman Allan A. Ackerman, P.C., Chicago, Ill., for defendants-appellants.

Frank Marine, U.S. Atty., Dept. of Justice, Washington, D.C., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before COFFEY, FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

Defendants Michael Posner and Sidney Muskovsky were convicted by a jury of fourteen violations of the Travel Act and of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO). The Travel Act violations were premised on the use of an interstate facility, the telephone, to promote, manage, facilitate and carry on acts of prostitution in violation of Illinois law, and the RICO violation was based on the predicate Travel Act violations. On appeal, the Defendants assert numerous errors. First, they claim that there was insufficient evidence to con-vict them of either the Travel Act or RICO conspiracy violations. Second, they claim that the government's conduct in gathering evidence against them was so outrageous that, as a matter of due process, their convictions must be reversed. Third, they claim that the trial court committed plain error in failing to instruct the jury on the definition of "pattern" for purposes of a RICO violation. Finally, the Defendants assert that, because Illinois law precludes conviction for both a substantive crime and a conspiracy to commit that substantive crime, their RICO conspiracy sentences must be vacated since they cannot be sentenced for both the Travel Act violations and the RICO conspiracy violation. Because we find no merit in these contentions, we affirm.

## I.

Defendant Michael Posner was the owner of the Roman House, a club located in Prairie View, Illinois. Defendant Sidney Muskovsky was the manager of that club from approximately 1979 to 1985. The Roman House was billed as a nude dancing establishment and featured a sign in front of the club which read "Nude, Nude, Nude." The defendants admitted that they intended to run the club as a "bust-out" joint—an establishment where the object is to take all of the customer's money. The government contended at trial, and apparently convinced the jury, that the Roman House succeeded in its objective by enticing the customer to buy very expensive drinks, using their credit cards, in exchange for sexual favors.

The Defendants were convicted of fourteen counts of using a facility in interstate commerce to promote, facilitate, manage and carry on an unlawful activity in violation of 18 U.S.C. Section 1952 (the Travel Act). The Defendants were also convicted of one count of conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity in violation of 18 U.S.C. Section 1962(d) (RICO). Defendant Posner was sentenced to ten years' imprisonment on the RICO conspiracy conviction and five years' probation on the

Travel Act counts, and was also fined a combined total of $95,000. Defendant Muskovsky was sentenced to four years' imprisonment on the RICO conspiracy count and five years' probation on the Travel Act violations. This appeal followed.

## II.

The Defendants attack their convictions in various ways under the rubric of insufficient evidence. First, they claim that some of the testimony against them was so unreliable that it should not have been taken into account by the jury. Without that testimony, they say, there is insufficient evidence to prove that they violated either the Travel Act or RICO. Second, the Defendants claim there is insufficient evidence to show that they entered into a conspiracy to operate the Roman House through a pattern of racketeering activities. Third, the Defendants assert that there was insufficient evidence of the interstate nexus required to support a RICO violation. Finally, the Defendants offer a grab bag of claims alleging insufficient evidence to support their Travel Act convictions.

When presented with a claim of insufficient evidence we will "affirm the verdict if the evidence, when viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the elements of the crime beyond a reasonable doubt." *United States v. Leibowitz*, 857 F.2d 373, 380 (7th Cir.1988); *United States v. D'Antonio*, 801 F.2d 979, 981 (7th Cir.1986). This is a very heavy burden for a defendant to meet. *United States v. Bruun*, 809 F.2d 397, 408 (7th Cir.1987). The burden becomes even heavier, however, where there is a claim of insufficient evidence because of the unreliability of one or more witnesses. Matters of witness credibility, absent "extraordinary circumstances," are solely for the jury to evaluate. *United States v. D'Antonio*, 801 F.2d at 982. With these standards in mind we now turn to the specific allegations of insufficient evidence made by the Defendants.

## A.

The Defendants claim that the testimony of three of the Government's witnesses, Ann Stefka, Kim Hileman and Nada Lauts, was "somewhere between ... inherently incredible and inherently improbable." They claim that such flawed testimony provides the extraordinary circumstances which allow a reviewing court to independently evaluate witness credibility. Moreover, with the testimony of these witnesses excluded, they believe there is insufficient evidence to support their convictions.[1]

Ann Stefka was a waitress at the Roman House from late 1979 to early 1981. She testified at trial that she "frequently" saw acts of oral sex and sexual intercourse take place at the Roman House between customers and the dancers and mixers.[2] She also testified that she saw both Posner and Muskovsky send girls to the back of the club to be with customers.[3] As a waitress, one of Ms. Stefka's duties was to clean up after the club had closed for the night. Ms. Stefka testified that in the course of this cleanup she occasionally found used

---

1. The Defendants' theory is that with this testimony excluded, all that is left is the testimony of various customers who did not know whether the sexual acts they engaged in were encouraged by the Roman House or were actually just a side business of a few of the girls working at the club. To this end, the Defendants go to great lengths to try to show that only a handful of girls were actually implicated in the predicate Travel Act counts. Since we do not think that the testimony of Ms. Stefka, Ms. Hileman, and Ms. Lauts can be disregarded, we do not need to address the Defendants' contention that all of the acts of prostitution at the Roman House were the work of "independent contractors."

2. Mixers were women who did not dance but whose responsibility it was to induce customers to buy drinks. Some, but not all of these mixers, engaged in sexual acts with the customers.

3. The Roman House consisted of a foyer and one large rectangular room. At one end of the room was a dance floor with tables surrounding it. At the other end of the room was an area that was kept completely dark and contained approximately six "love seats" or "love couches." We will refer to this section of the Roman House as the "back area."

sexual paraphernalia such as condoms in the back of the club.

On cross-examination, defense counsel extensively questioned Ms. Stefka on whether she had ever heard Posner tell his employees not to engage in sex. Ms. Stefka testified that she had not heard Posner say this, whereupon defense counsel attempted to impeach her with her grand jury testimony asserting that she had heard Posner make such a statement. Defense counsel also attempted to bring out that Ms. Stefka had a drug problem at the time she worked at the Roman House, a charge which Ms. Stefka denied.

Kim Hileman worked as a dancer and a mixer at the Roman House in 1980. She testified that she and other girls engaged in oral sex and sexual intercourse with customers in the back area of the Roman House. According to Ms. Hileman, when a customer entered the Roman House he would be seated at a table near the dance floor where a mixer would eventually join him. If the customer agreed to buy drinks for the mixer, the mixer would ask the customer if he would like to go to the back area where they could be "more comfortable." Once in the back, she would attempt to induce the customer to buy bottles of "bubbly," a non-alcoholic mixture of juice and soda. Only after the customer had purchased three or four bottles of bubbly, at approximately $96 a bottle, would she engage in sexual intercourse or oral sex with the customer. Ms. Hileman further testified that Muskovsky sent her to the back area with the knowledge that she would engage in oral sex or sexual intercourse and never told her not to engage in such acts.

On cross-examination the defense established that Ms. Hileman had a serious drinking problem during part of the time she worked at the Roman House. The defense also introduced evidence that Ms. Hileman told the FBI, prior to the grand jury proceedings in this case, that she did not engage in sexual conduct of any kind at the Roman House. Ms. Hileman admitted that she was fired from the Roman House because of her failure to show up for work and because of her drinking problems.

Nada Lauts, from May to October, 1976, was also a dancer and mixer at the Roman House. Ms. Lauts, like Ms. Hileman, testified that she attempted to get customers to buy bottles of "champagne" and then go to the back area where they could "party and have a good time." Ms. Lauts further testified that she saw other mixers engage in oral sex and sexual intercourse with customers in the back area and that she saw Defendant Posner send girls to the back area. During both direct and cross-examination, Ms. Lauts admitted that in exchange for her testimony she was given immunity from prosecution, was given aid in trying to settle problems she had with the IRS, and that, because of her testimony, a case against her husband involving drug possession may have been dropped.

█ Defendants claim that the testimony of these three witnesses should be disregarded because the testimony was "somewhere between inherently incredible and inherently improbable." Initially, we note that the Defendants have waived this claim by failing to raise it before the district court. *See United States v. Carter*, 720 F.2d 941, 945 (7th Cir.1983) (failure to present issue to district court results in a waiver of that issue on appeal). Even if we were to reach the Defendants' claim on the merits, however, we would find that the testimony was properly before the jury. Defendants cite *United States v. Rosenberg*, 416 F.2d 680, 683 (7th Cir.1969), for the proposition that we may disregard testimony which is "inherently improbable." In *Rosenberg*, evidence gathered by government agents was excluded at trial because the agents lacked a search warrant at the time they obtained the evidence. On appeal, the government claimed that its agents were lawfully on the premises of the corporation without a search warrant since the agents were simply returning a bill of sale. We found that explanation inherently improbable, in the sense that it confounded logic, in light of the facts surrounding the visit to the corporation's offices.

In contrast to *Rosenberg*, it would not confound logic for us to believe the testimony of Stefka, Hileman and Lauts. To the contrary, their testimony was remarkably consistent with each other's and consistent with much of the testimony from other sources. True, there was some reason to doubt the testimony of Stefka and Hileman based on their prior sworn testimony and the testimony of Lauts based on her possible bias, but the Defendants had the opportunity to inform the jury of these problems. "These matters [of credibility and bias] affect only the witnesses' credibility and, as such, are 'solely for the jury to evaluate.'" *United States v. D'Antonio*, 801 F.2d at 982. Because there is nothing extraordinary about the circumstances of this case, we cannot say that the testimony of the three witnesses was so inherently improbable or incredible that it should be disregarded.

### B.

■ Defendants' next contention is that there was insufficient evidence upon which the jury could find that they entered into a conspiracy to operate the Roman House through a pattern of racketeering. Posner claims that there was no evidence that he was involved in the affairs of the Roman House when the alleged predicate acts occurred between 1982 and 1984. Posner argues that, at most, he was in the position of one who is associated with a conspiracy or knows about a conspiracy but does not actually become involved in the conspiracy. Similarly, Muskovsky claims that there was insufficient evidence to find that he entered into an agreement to operate the Roman House through a pattern of racketeering activity.

To find a defendant guilty of conspiracy to violate RICO, the government must show that the defendant "was aware of the essential nature and scope of the enterprise and intended to participate in it." *United States v. Bruun*, 809 F.2d at 410. While there is no need to prove that the defendant intended personally to perform the two predicate acts required for RICO liability, *United States v. Neapolitan*, 791 F.2d 489,

498 (7th Cir.), *cert. denied*, 479 U.S. 940, 107 S.Ct. 422, 93 L.Ed.2d 372 (1986), the government does have to show more than "mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions...." *United States v. Percival*, 756 F.2d 600, 610 (7th Cir.1985); *see also United States v. Williams*, 798 F.2d 1024, 1028 (7th Cir. 1986). The government has to show that there was an agreement between the members of the conspiracy. Of course, direct evidence of that agreement need not be shown, "an agreement can be inferred from the circumstances." *United States v. Neapolitan*, 791 F.2d at 501.

In this case, there was an abundance of evidence from which the jury could find that the Defendants knew the nature and scope of the enterprise and intended to participate in it. For example, an undercover FBI agent testified that Posner admitted to him that he ran the Roman House as a "bust-out" joint where the "girls push the customer as far as they could push them to get all of his money before he had any kind of sexual gratification." Posner made additional statements to the FBI indicating that he knew charge cards were being used to pay for the sexual acts occurring at the Roman House. Muskovsky also admitted, in tape recorded conversations with undercover FBI agents, that, under his supervision, acts of prostitution occurred at the Roman House. Muskovsky told the agent that his customers "would charge between a thousand and fifteen hundred dollars on each visit for his favorite girl" but that when two men came in together they "usually [did] not spend enough money to get ... laid." These admissions show that the Defendants knew about the activities at the Roman House and allowed the jury to infer that they agreed to participate in them.

The Defendants claim that these admissions are insufficient to support their conspiracy convictions because a person cannot be found guilty of conspiracy based solely on his own admissions. Defendants misstate the law. The correct rule is that a defendant cannot be convicted of conspiracy, or for that matter any crime, based

solely on his own *uncorroborated* admissions made *after* the conspiracy has ended. *United States v. Fearn*, 589 F.2d 1316, 1321 (7th Cir.1978) ("It is a settled principle ... that a conviction must rest upon firmer ground than the *uncorroborated* admission or confession of the accused") (emphasis added); *United States v. Soteras*, 770 F.2d 641, 644 n. 4 (7th Cir.1985) (the corroboration rule "does not apply to statements made prior to or during the commission of the crime").

In this case there is no doubt that each of the Defendants' admissions was made during the pendency of the conspiracy. Moreover, there was sufficient evidence to corroborate their admissions. First, Nada Lauts testified that Posner asked her to show him how she handled customers and then "proceeded to open up his pants" and told her to "show me what you do." Similarly, there was testimony from Kim Hileman that Muskovsky told her that "he wanted to get some of what the customers were getting," whereupon they "had oral sex and [sexual] intercourse." Second, there was ample evidence that both Posner and Muskovsky sent women to the back area to be with men, called in the credit card charges with which customers paid for the illegal activities, and kept files on the preferred sexual conduct and partners of various customers. Thus, it was proper for the jury to consider the admissions in deciding that Posner and Muskovsky conspired to conduct the activities of the Roman House through a pattern of racketeering activities.[4]

### C.

■ Defendants next claim that there was insufficient evidence of an interstate nexus to support their RICO conspiracy convictions. In order to have federal jurisdiction under RICO, the government must show either that the enterprise is engaged in interstate commerce or that the activities of the enterprise affect interstate commerce. 18 U.S.C. Section 1962(c); *see United States v. Conn*, 769 F.2d 420, 423–424 (7th Cir.1985). In this case the Government contended that the activities of the enterprise, the Roman House, affected interstate commerce through its use of the interstate phone system to get approval for credit card transactions.

Defendants claim their use of an interstate facility, the telephone, is insufficient to meet the RICO nexus requirement for two reasons. First, they assert that because their use of the telephone was infrequent, the effect on interstate commerce from the use was so small that it is insufficient to meet the nexus requirement. Second, they claim that because the government encouraged the use of the telephone by the Roman House, that use cannot serve as the requisite interstate nexus.

The required nexus between the activities of the enterprise and interstate commerce need not be great; "even a minimal effect on interstate commerce satisfies this jurisdictional element." *United States v. Bagnariol*, 665 F.2d 877, 892 (9th Cir.1981), *cert. denied*, 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Thus, this court has held that the activities of the Cook County Circuit Court affect interstate commerce simply because it purchases supplies and office equipment from companies located outside of Illinois. *United States v. Murphy*, 768 F.2d 1518, 1531 (7th Cir.1985), *cert. denied*, 475 U.S. 1012, 106 S.Ct. 1188, 89 L.Ed.2d 304 (1986). Given the minimal effect on commerce needed to satisfy the "jurisdictional" element, the telephone use by the Roman House sufficiently affects interstate commerce to satisfy the RICO nexus requirement. Moreover, even leaving out the telephone use, the Roman House, like the Cook County Circuit Court, affected interstate commerce through its purchase of supplies from out-of-state companies.[5]

---

**4.** Had this evidence been presented as independent circumstantial evidence, rather than corroborative evidence, it would have been enough to allow the jury to infer that the Defendants knowingly agreed to conduct illegal prostitution activities at the Roman House through use of interstate facilities.

**5.** The Defendants stipulated at trial that they used plastic cups supplied from a company in Ohio, cocktail napkins supplied by a company

Defendants contend that the telephone use should not be counted toward the nexus requirement because that use was encouraged by the government.[6] As will be discussed more fully below, the company to which the Roman House placed the phone calls in order to get approval for credit card transactions, the National Credit Card Service, was in fact operated by the FBI. According to the Defendants, the FBI's operation involved "promoting the use of the credit cards .. [sic] and thus the interstate telephone calls." Defendants argue that because the FBI promoted the use of the telephone system, that use cannot now be used as the basis for finding an effect on interstate commerce.

In *United States v. Archer*, 486 F.2d 670, 681 (2d Cir.1973), the Second Circuit held that telephone calls which were made at the behest of federal agents and made solely for the purpose of achieving federal jurisdiction did not meet an interstate commerce requirement. The court stated that Congress did not mean to reach cases "where the federal officers themselves supplied the interstate element and acted to ensure that an interstate element would be present." *Id.* at 682. Although we have never been presented with a case where federal jurisdiction was inappropriate because it was "manufactured," *see United States v. Podolsky*, 798 F.2d 177 (7th Cir. 1986) (questioning whether there is any vitality to the idea of "manufactured" jurisdiction outside of circumstances constituting entrapment or cancelling an element of the crime), we have not completely foreclosed the possibility of such a decision. *See United States v. Anderson*, 809 F.2d 1281, 1287 (7th Cir.1987).

Even if there is a viable doctrine of manufactured jurisdiction, however, we do not believe that it can be applied to this case. The Defendants made telephone calls in interstate commerce in order to get credit card approvals even *before* the government took over the credit card operation. Unlike *Archer*, this is not a case where the government supplied the nexus to interstate commerce and acted to ensure that it would be present. In sum, the Defendants' telephone activities were not "manufactured," and the activities had a sufficient effect on interstate commerce to meet the RICO nexus requirement.

D.

Defendants also claim that, in three areas, there was insufficient evidence to support their Travel Act convictions. First, they contend that their indictments failed to specify what acts constituted the "thereafter" acts required by the Travel Act. Second, Defendants assert that the impermissible acts of prostitution were too sporadic to be the basis of Travel Act violations. Finally, the Defendants argue that the Government failed to prove the requisite effect on interstate commerce because the use of the telephone was not "significantly related" to the activity constituting the violation. Each of these contentions can be disposed of in relatively short order.

■ A Travel Act violation occurs when a person uses any facility in interstate commerce with intent to promote or facilitate an unlawful activity and thereafter promotes or facilitates the illegal activity. 18 U.S.C. Section 1952(a).[7] The Defendants

---

from Wisconsin, and natural gas produced in six states other than Illinois.

**6.** This is not technically an insufficiency of the evidence argument. Even if there was indisputable evidence that the telephone calls actually took place, the Defendants could still assert that the calls were insufficient to form the basis of the interstate nexus. We note that there was ample evidence that the telephone calls were made so that a true insufficient evidence argument on this point would be meritless.

**7.** Section 1952(a) states, in its entirety:

Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—
(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
and thereafter performs or attempts to perform any of the acts specified in subpara-

assert that their Travel Act indictments failed to specify what illegal acts they performed or facilitated following their use of interstate facilities.[8] However, there is no requirement that the indictment specifically identify the "thereafter" acts. As the Eighth Circuit recently noted, "an indictment is sufficient if it sets forth the offense in the statutory language, provided that the statute sets out the necessary elements of the offense." *United States v. Cerone*, 830 F.2d 938, 951 (8th Cir.1987), *cert. denied,* — U.S. ——, 108 S.Ct. 1730, 100 L.Ed.2d 194 (1988). The indictments here did set forth the Travel Act offense in the statutory language. Thus, the failure to specify the "thereafter" acts was not error.

■ The Defendants' next claim in regard to the Travel Act is that even if there were any illegal activities at the Roman House, those activities were too sporadic to form the basis of the "business enterprise" required by the Act. The Travel Act defines "unlawful activity" as "any business enterprise involving ... prostitution offenses in violation of the laws of the state in which they are committed." 18 U.S.C. Section 1952(b). The term "business enterprise" has been construed to require more than isolated, casual, or sporadic activity. *United States v. Corbin*, 662 F.2d 1066, 1073 n. 16 (4th Cir.1981). Rather, to be a business enterprise, the activities must be part of a "continuous course of conduct." *Id.* at 1072; *United States v. Krevsky*, 741 F.2d 1090, 1094 (8th Cir.1984).

In this case the evidence showed that acts of prostitution took place at the Roman House over a span of at least nine years. While it may be true that, as the Defendants claim, the number of custom-

ers who were involved in acts of prostitution was very small when compared with the total number of customers, proof that a large percentage of customers were involved in the illegal activity is not required. So long as the illegal activity was not an isolated or sporadic event, which the prostitution here was not, a business enterprise has been shown for purposes of the Travel Act.

■ Finally, the Defendants assert that their Travel Act convictions cannot stand because their use of interstate facilities was not "significantly related" to the charged illegal activities. Again, the Defendants have correctly stated a principle of law and then misapplied that principle to the facts of their case. They are quite correct that in "a Travel Act prosecution the interstate travel or use must relate significantly, rather than incidentally or minimally, to the illegal activity." *United States v. Raineri*, 670 F.2d 702, 717 (7th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 446, 74 L.Ed.2d 601 (1982); *see also United States v. Peskin*, 527 F.2d 71, 77 (7th Cir. 1975). This does not mean, however, that the interstate use must be indispensable to the illegal activity; it is enough that the use facilitates the illegal activity. *United States v. Raineri*, 670 F.2d at 717; *United States v. Stern*, 858 F.2d 1241, 1247 (7th Cir.1988). In this case, the use of the interstate telephone system to attain credit card approvals was significantly related to the prostitution activities. It is clear that the ability of the Defendants to get prior approval of credit card transactions facilitated the prostitution activities by ensuring that payment for those activities would be forthcoming. Thus, the evidence was suffi-

---

graphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

8. Each of the Travel Act counts were set out in substantially similar form in the indictment and read:

That on or about [some date in 1982–1984], in the Northern District of Illinois, Eastern Division, and elsewhere, MICHAEL POSNER, and SIDNEY MUSKOVSKY, defendants herein, did use and cause the use of a facility in interstate commerce, the interstate telephone

communications system, ... with the intent to promote, manage, establish and carry on and facilitate the promotion, management, establishment and carrying on of an unlawful activity, that is a business enterprise involving prostitution in violation of the laws of the State of Illinois, ... and thereafter said defendants did perform and cause to be performed acts to promote, manage, establish and carry on, and facilitate the promotion, management, establishment and carrying on of that unlawful activity.

cient in all respects to sustain the Defendants' convictions for violation of the Travel Act.

### III.

■ Defendants assert that the Government's conduct in gathering evidence against them was so outrageous that their convictions should be vacated. The doctrine of outrageous government conduct, first articulated in *United States v. Russell*, 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973), has had a checkered history. In *Russell*, the Supreme Court said that even in a case not rising to the level of entrapment, there "may some day be presented ... a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* Nevertheless, neither the Supreme Court nor this circuit have ever held that the government's conduct in a particular case was so outrageous that due process required a dismissal. *See United States v. Shoffner*, 826 F.2d 619, 626 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987). Still, we have left open the possibility that we might some day be presented with a case of government conduct which was so "truly outrageous" that due process would bar conviction even where no independent constitutional right was violated. *Id.*

The Defendants' claim of outrageous government conduct stems from the FBI's operation of a credit card approval company, the National Credit Card Service (NCS), as an undercover operation to gather information on prostitution activities in the Chicago area. According to FBI agent Larry Damron, NCS set up and operated credit card accounts for the Roman House, and operations like it, ostensibly to hide the true source of the credit card charges from the banks. In reality, the goal of NCS was to gain as much information as possible about operations such as the Roman House. The Defendants say they are "troubled by the skullduggery of such

[government] behavior, surprised by its crudeness, stunned by its lack of social consciousness and, [sic] extremely doubtful of its legality." We are not troubled by the FBI's operation and we have no doubt of its legality.

The government's use of a credit card service to "sting" enterprises such as the Roman House is not outrageous. The government has broken no laws nor violated the constitutional rights of any citizen. This is not a case where the Roman House's conduct can be attributed to government suasion; the Roman House used credit card approval services well before the government took over NCS. Under those circumstances, the Defendants have fallen far short of showing that the government's conduct was so "truly outrageous" that due process bars conviction.

### IV.

■ Defendants next claim that the trial court committed plain error by failing to instruct the jury on the definition of "pattern" for purposes of RICO. The court charged the jury that the government must prove that

> the defendant knowingly conspired with another person to conduct and participate in the conduct of the affairs of that enterprise, directly or indirectly, through a pattern of racketeering activity, namely acts in violation of the laws of the State of Illinois against prostitution as alleged in Counts 2 through 15 of the indictment....

The judge further instructed the jury that " 'pattern of racketeering activity' means two acts of racketeering activity, the last of which occurred within 10 years after the commission of a prior act of racketeering." The Defendants claim these instructions were deficient because they failed to define what is meant by a "pattern" of racketeering activity. According to the Defendants, these instructions would allow the jury to convict based on a series of disconnected acts, a result foreclosed by the Supreme Court's definition of the pattern element. Because the Defendants failed to raise this claim before the District Court, we will

review their contention under the plain error standard. *United States v. Conn,* 769 F.2d 420, 425 (7th Cir.1985); *United States v. Kerley,* 838 F.2d 932, 937 (7th Cir.1988) ("A plain error is not just one that is conspicuous but one whose correction is necessary to prevent a 'miscarriage of justice.'").

The Supreme Court has stated, in dicta, that to find a "pattern" of racketeering activities there must be both continuity and relationship between (or among) the predicate acts. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985). This circuit has followed the Supreme Court's admonition and has required that the government prove "continuity plus relationship" in order to show a pattern for purposes of RICO. *See, e.g., United States v. Horak,* 833 F.2d 1235, 1240 (7th Cir.1987); *Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1304 (7th Cir.1987). The Defendants claim that the district court committed plain error by failing to instruct the jury that "continuity plus relationship" must be shown. We disagree.

Initially, we note that if the district court's instruction was error, it was error that was invited by the Defendants. The Defendants submitted an instruction, parts of which were eventually incorporated into the instructions actually given, substantially similar to the instruction given by the district court. Where error is invited, not even plain error permits reversal. *See United States v. Wiggins,* 530 F.2d 1018, 1020 (D.C.Cir.1976) ("invited error generally does not require reversal, *i.e.,* appellant cannot now complain that the court gave an instruction which he requested."); *United States v. Young,* 745 F.2d 733, 752 (2d Cir.1984), *cert. denied,* 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985) ("not even the plain error doctrine permits reversal on the ground that the trial court granted a defendant's request to charge.").

■ Moreover, even if the trial court's instruction amounted to error in this case, it was not plain error. The trial court instructed the jury that they had to find a "pattern of racketeering activity" before they could find guilt. This is not a case where the jury was not instructed at all on an essential element of the crime, *United States v. Pope,* 561 F.2d 663, 670 (6th Cir. 1977), nor is this a case where the trial court's instruction amounted to a directed verdict against the defendant on an element of the crime. *United States v. Kerley,* 838 F.2d at 938. Instead, this was simply a case where the trial court failed to fully define an element of the crime. Such an omission is not the kind of "miscarriage of justice" which the plain error doctrine is designed to correct. *See United States v. Sherwood,* 770 F.2d 650, 654 (7th Cir.1985) (no plain error where trial court failed to define the term "willful" in a case where an element of the crime was willful activity on the part of the defendant).

In *United States v. Grayson,* 795 F.2d 278, 288 (3d Cir.1986), *cert. denied,* 479 U.S. 1054, 107 S.Ct. 927, 93 L.Ed.2d 978 (1987), the Third Circuit was presented with an allegation of error nearly identical to the one made in this case. In *Grayson,* the defendant claimed that the trial court erred in failing to instruct the jury that a "connection" was required between the predicate acts in order to convict on a RICO charge. *Id.* Instead, the jury was instructed only that "a pattern of racketeering activity is defined to be two or more acts of racketeering which occurred within ten years of each other." *Id.* The *Grayson* court held that even if the instruction was incomplete, it did not amount to reversible error since even a "glance at the predicate acts for the RICO offense charged" showed that, to find guilt, the jury would necessarily have had to conclude that there was continuity and relationship. *Id.* at 290.

Just as in *Grayson,* the jury's finding of guilt on all of the predicate Travel Act counts in this case necessarily established the requisite continuity and relationship. All of the predicate acts involved acts of prostitution within a two-year span. The acts were alleged to have occurred at the same location and to have resulted from coordinated action on the part of the Defendants. Given their finding of guilt on

all of the charged Travel Act counts, the jury necessarily found the continuity and relationship among the predicate acts necessary to support a RICO conviction.

## V.

Finally, the Defendants contend that their RICO sentences must be vacated because Illinois law would not allow conviction and sentencing for both the RICO conspiracy and Travel Act convictions. They correctly point out that, under Illinois law, one may not be convicted and sentenced for both a substantive crime and a conspiracy to commit that substantive crime. *See People v. Walker*, 84 Ill.2d 512, 50 Ill.Dec. 718, 727, 419 N.E.2d 1167, 1176 (1981) ("Under Illinois law, a defendant cannot be convicted of both the inchoate and the principal offense."). According to the Defendants, this principle has been violated by their convictions and sentencing on both the RICO charge (conspiracy) and the Travel Act charge (substantive charge).

The Defendants' argument goes as follows. Both RICO and the Travel Act incorporate elements of state law. The Travel Act explicitly incorporates state law prostitution in its definition of "unlawful activity." RICO implicitly incorporates state law by making a violation of the Travel Act eligible for inclusion as one of the two necessary predicate acts. Defendants claim that since state offenses are incorporated into federal law, state defenses must also be incorporated. Thus, they claim that if there would be a defense under state law to the state offense incorporated in the federal charge, then the federal charge cannot stand. Defendants claim that this principle is implicated in this case since state law would afford a defense to conviction and sentencing for both the substantive Travel Act violations and inchoate RICO violations (which they claim implicates state conspiracy law). This argument is flawed in several respects.

First, the Defendants' argument requires that they show that their RICO conspiracy convictions somehow implicate state conspiracy law. They claim that state conspiracy law is implicated not directly but as the overall "theory of the prosecution." But, the Defendants are incorrect in asserting that state conspiracy law is implicated in this case. Their Travel Act convictions were based on violations of the Illinois prostitution laws, not Illinois conspiracy laws. Their RICO convictions were based on the predicate Travel Act convictions and *federal* conspiracy law. RICO conspiracy is a federal crime and its conspiracy element is defined solely by federal law.

A claim similar to that of the Defendants' was made in *United States v. Johnson*, 426 F.2d 1112 (7th Cir.1970). In *Johnson*, the defendant was charged with both conspiracy to commit burglary and the substantive offense of burglary in connection with the theft of a safe from a federal institution. The substantive burglary count was made an offense by the Assimilative Crimes Act which incorporated state definitions of crimes into federal law where no similar federal criminal statute existed. *Id.* at 1116. The conspiracy count was based on a federal statute that made conspiracy to commit any federal crime, including crimes made federal by the Assimilative Crimes Act, a federal violation. The defendant in that case claimed that he was improperly sentenced for committing two crimes since Illinois law precluded conviction for both the substantive offense (burglary) and the inchoate offense (conspiracy to commit burglary). The court rejected that contention holding that Illinois conspiracy law did not control. Thus, the defendant was properly convicted under two separate federal provisions.

■ The Defendants in this case were also properly convicted under two separate federal provisions. Nowhere in the RICO indictment was state conspiracy law implicated. RICO conspiracy is a federal offense, just as the conspiracy in *Johnson* was a federal offense. Thus, state law defenses to state law conspiracy charges are inapplicable to a federal RICO conspiracy charge.

■ Second, even if state conspiracy law was implicated in some way, the Defendant's claim would fail since only state

*substantive* defenses are incorporated into federal law for purposes of RICO, not state procedural defenses. Thus, in *United States v. Cissell,* 700 F.2d 338, 339–40 (6th Cir.1983), the court dismissed a RICO indictment where the government failed to prove that the defendants had actually violated state law as defined by the state bribery statute. *See also United States v. Tonry,* 837 F.2d 1281 (5th Cir.1988) (Travel Act indictment for acts of bribery in violation of Louisiana law dismissed where person bribed was a non-Louisiana official and Louisiana law did not make it a crime to bribe a non-Louisiana official).

By comparison, in *United States v. Friedman,* 854 F.2d 535, 565 (2d Cir.1988), no dismissal was required where the state used as the two RICO predicate acts two crimes which could not engender separate convictions under state law. In *Friedman,* the defendant claimed that the two bribes he was charged with making could not constitute separate predicate acts since under state law the bribes at issue could only constitute a single offense. *Id.* The court assumed that the defendant had correctly stated the state law but nevertheless held that the two bribes could constitute separate RICO predicate acts. The court characterized the state rule as procedural and held that "state procedural rules ... are irrelevant to RICO." *Id.; See also United States v. Licavoli,* 725 F.2d 1040, 1047 (6th Cir.1984) (RICO was "not meant to incorporate state procedural law."). The Ninth Circuit has reached the same conclusion for purposes of the Travel Act. *See United States v. Bertman,* 686 F.2d 772, 774 n. 2 (9th Cir.1982) ("we seriously doubt that non-substantive state law defenses, such as the running of the statute of limitations, are cognizable in a Travel Act prosecution.").

The state law at issue here is procedural in nature. The rule does not define what is a crime in Illinois but simply says that although there may be two possible crimes, there can only be one conviction and sentence. The fact that there could only be one state sentence should have no effect on Congress' determination that where a RICO violation can be found based on Trav-

el Act violations, more than one sentence is appropriate. Therefore, we hold that there was no error in convicting and sentencing the Defendants for violation of both RICO and the Travel Act.

## VI.

The Defendants have failed to show any reversible error in the district court. We therefore AFFIRM.