**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Daniel J. O'CONNOR, Defendant–Appellant.**

**No. 90–1103.**

United States Court of Appeals, Seventh Circuit.

Argued Aug. 8, 1990.

Decided Aug. 21, 1990.

Lisa K. Osofsky, Barry R. Elden, Asst. U.S. Atty., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Patrick A. Tuite, Tuite & Associates, Chicago, Ill., David S. Mejia, Oak Park, Ill., for defendant-appellant.

Before POSNER and EASTERBROOK, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

Daniel J. O'Connor, a crooked policeman, got caught in a sting operation. Federal agents posing as shady auto parts dealers—not above buying stolen cars to satisfy their customers' wants or cannibalize for parts—approached O'Connor and asked for notice of any potential investigations that might affect their business. At the initial meeting O'Connor described the tips he had provided to David Gorzellaney, operator of a bowling emporium cum gambling house, who introduced O'Connor to the agents. Gorzellaney was by then cooperating with the FBI. O'Connor boasted to "Bill Burns" (the lead agent's *nom de guerre*) that he had not only tipped Gorzellaney off to raids but also once took part in a raid and hid from fellow police officers evidence that Gorzellaney had overlooked.

Burns told O'Connor that he needed similar aid and also wanted security for legitimate used-parts sales. O'Connor generously offered to use his patrol car to help Burns transport stolen merchandise and to wear a beeper so that Burns could reach him as needed. O'Connor did not come cheap. He asked Burns: "What wouldn't hurt you?", to which the agent replied "Well, three bills [$300 per month] won't hurt me." O'Connor replied: "Maybe we should start at five." Burns agreed, provided the monthly payments were in installments. O'Connor got $300 on the spot. During the next two months he received another $650 in four installments. In exchange O'Connor agreed to give Burns news pronto, to "put a little feeler out" to potential buyers of stolen merchandise, and to obtain information about the addresses of the owners of cars whose license plate numbers Burns would furnish. Burns's "customers" would "shop" for cars by cruising the streets to find models they liked, then furnishing license plate numbers; Burns needed to track down the cars and arrange for their "appropriation". During the two months in which payments continued, O'Connor learned and told

Burns that Gorzellaney had become a "pigeon" for the FBI and should be avoided. O'Connor also furnished computer printouts showing registration information for cars to be stolen.

Burns stopped paying O'Connor after two months, pleading ill health and poor business. O'Connor tried to get in touch with Burns, paging him and even once following him in a patrol car. Burns promised to resume payments. He never did; instead a grand jury indicted O'Connor, charging him with engaging in a pattern of racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68, and extortion, in violation of the Hobbs Act, 18 U.S.C. § 1951. Convicted after a bench trial, O'Connor has been sentenced to 2½ years' imprisonment, to be followed by 3 years' probation.

■■ O'Connor contends that the evidence is insufficient to establish a "pattern" of racketeering, a necessary ingredient of the RICO offense. He emphasizes that "Burns" and the other agents determined the number and timing of payments that would be made, and he maintains that there must be a "pattern" from his side as well as from the agents'. True enough, but the trier of fact was entitled to conclude that O'Connor was prepared to (and did) undertake an extended series of criminal acts (taking bribes, providing information and protection) that would continue indefinitely, so long as Burns needed his services. Fences do not pay all the money up front; reciprocity—a "pattern" of money for information in increments—is important to maintain trust and loyalty.

Although the inference of a pattern was by no means open and shut (given the leading role played by the FBI), the evidence permitted a reasonable trier of fact to conclude beyond a reasonable doubt that O'Connor had committed himself to an enduring series of criminal acts, sufficient to establish a "pattern" under *H.J., Inc. v. Northwestern Bell Telephone Co.*, — U.S. ——, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989), and *United States v. Horak*, 833 F.2d 1235 (7th Cir.1987). O'Connor points

to other cases in which this court has concluded that the evidence did not make out a pattern. There are many such cases—perhaps there is even a pattern of using the "pattern" requirement to trim off the excesses in civil RICO suits. *H.J.* emphasizes the impossibility of fitting all RICO cases to a single pattern, and nothing of moment could be achieved by surveying and attempting (probably vainly) to reconcile the many cases. Once a case has been tried, the evidence and reasonable inferences must be taken in the light favorable to the verdict. That perspective, when added to our holding in *Horak*, requires affirmance.

■■ As for extortion: O'Connor points out that the agents did not testify that O'Connor put them in fear that if they did not pay, he would act against them in an official capacity. Under *United States v. O'Grady*, 742 F.2d 682 (2d Cir.1984) (in banc), *United States v. Aguon*, 813 F.2d 1413 (9th Cir.1987), modified in banc, 851 F.2d 1158 (1988), and *United States v. Jenkins*, 902 F.2d 459, 467 (6th Cir.1990), inducement is an essential ingredient of the Hobbs Act offense. As the final opinion in *Aguon* observes, however, a system of payment in exchange for official acts can itself demonstrate inducement: there is an *implied* threat of unpleasant consequences for nonpayment, whenever payment is a way of life. At all events this court, in common with several other circuits, e.g., *United States v. Spitler*, 800 F.2d 1267, 1274–75 (4th Cir.1986); *United States v. Swift*, 732 F.2d 878, 880 (11th Cir.1984); *United States v. Jannotti*, 673 F.2d 578, 595 (3d Cir.1982) (in banc), has rejected the strong inducement requirement of *O'Grady*, and has held that a public employee in a position to dole out or withhold official favors who solicits or accepts bribes under color of official right commits the crime of extortion. E.g., *United States v. Davis*, 890 F.2d 1373, 1378 (7th Cir.1989); *United States v. Garner*, 837 F.2d 1404, 1423 (7th Cir.1987); *United States v. Murphy*, 768 F.2d 1518, 1530 (7th Cir.1985); *United States v. Price*, 617 F.2d 455, 458 (7th Cir.1979); *United States v. Braasch*, 505 F.2d 139, 151 (7th Cir.1974) (Clark, J.);

*United States v. Crowley*, 504 F.2d 992, 995 n. 5 (7th Cir.1974); *United States v. Staszcuk*, 502 F.2d 875, 878 & n. 5 (7th Cir.1974), adopted in banc, 517 F.2d 53, 60 (1975) (Stevens, J.). If we were to overrule all of these (and many similar) cases, as O'Connor asks us to do, a conflict among the circuits would remain. No matter which is the "best" reading of the Hobbs Act, our circuit's approach is too firmly established and too frequently reaffirmed to be revisited. The task of producing agreement among the circuits is for Congress or the Supreme Court.

AFFIRMED.