UNITED STATES of America,
Plaintiff–Appellee,

v.

Frank A.J. STODOLA, Defendant–
Appellant.

No. 88–3000.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 5, 1991.

Decided Jan. 6, 1992.

Michael A. Thill, Asst. U.S. Atty. (argued), Office of the U.S. Atty., Dyer, Ind., for plaintiff-appellee.

Robert C. Perry (argued), Indianapolis, Ind., for defendant-appellant.

Before WOOD, Jr. and MANION, Circuit Judges, and ROSZKOWSKI, District Judge.*

MANION, Circuit Judge.

Defendant-appellant Frank A.J. Stodola, a life-long resident of Lake County, Indiana, has had a full career as attorney, judge and politician. Stodola was a practicing attorney in Hammond, Indiana for approximately thirty-seven years. He served as Hammond City Court Judge from 1955 to 1966. He served as Lake County Superior Court Judge from 1967 to 1970. In 1977, Stodola was an unsuccessful candidate for the United States Congress. In 1980, Stodola was elected to the Board of Commissioners for Lake County, Indiana; he remained on the Board until 1984. During his tenure as a commissioner, Stodola became embroiled in illegal schemes to take kickbacks in exchange for contracts with Lake County.[1]

On December 2, 1987, a grand jury returned a five-count indictment against Stodola. Count 1 charged Stodola with conducting an enterprise's affairs through a pattern of racketeering activity in violation of RICO, 18 U.S.C. § 1962(c). The predicate acts alleged in Count 1 were twenty violations of the Indiana bribery statute—three bribes received from Professional Building Maintenance Company (PBM) and seventeen bribes received from General Maintenance Services Company (GMS) in exchange for the contract to clean the county offices. Count 2, which related to the payments obtained from PBM, and Count 3, which related to the payments obtained from GMS, charged Stodola with conspiracy to affect commerce by extortion in violation of the Hobbs Act, 18 U.S.C.

---

* The Honorable Stanley J. Roszkowski, District Judge for the Northern District of Illinois, is sitting by designation.

1. The other Commissioners during that time period were Rudy Bartolomei and Noah Atterson Spann. Bartolomei was a Commissioner from 1977 to November 1983, when he was appointed Lake County Sheriff; Spann was a Commissioner from 1975 to 1986. Both Bartolomei and Spann pleaded guilty to various criminal charges for taking kickbacks while serving as Lake County Commissioners. After serving some time in jail, Bartolomei entered into a plea agreement with the government; he agreed to cooperate with federal authorities in their investigation of corruption in Lake County in exchange for a reduction in his sentence to a year and a day. Bartolomei, now in the Federal Witness Protection Program, testified against Stodola at trial. Spann refused to testify at trial invoking his rights under the Fifth Amendment.

§ 1951. Counts 4 and 5 charged Stodola with making false income tax returns, 26 U.S.C. § 7206(1). A jury found Stodola guilty of all counts except Count 2, the PBM extortion count. The district court sentenced Stodola to a total of 12 years imprisonment.

Stodola appeals his convictions on Counts 1 and 3, contending there was insufficient evidence to prove a pattern of racketeering activity under RICO and insufficient evidence to prove a conspiracy to commit extortion under the Hobbs Act. Stodola also challenges the jury instructions on RICO and extortion. For the reasons set forth below, we affirm the convictions.

## I.

An elected, three-member Board of Commissioners has exclusive authority to transact the business of Lake County, Indiana, including entering contracts on behalf of the County. Ind.Code § 36–2–2–2. By law, contracts with Lake County are awarded through sealed bidding to the lowest responsible and responsive bidder. Ind. Code §§ 36–1–9–3, 36–1–9.1–4. The historical practice of some Lake County Commissioners, however, was to award contracts to their "friends"—companies who gave the Commissioners kickback money. *See, e.g., United States v. Forszt*, 655 F.2d 101 (7th Cir.1981) (Lake County Commissioner Joseph J. Forszt, who received payments from vendors in exchange for Lake County contracts from 1949 to 1975, was convicted of engaging in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c)). As ex-Commissioner Rudy Bartolomei stated at trial, all contracts had to be approved by the Commissioners, and they routinely awarded contracts to their "friends"—companies who paid them kickback money.

Prior to his election to the Lake County Board of Commissioners, Stodola had heard rumors about payments being made to the Commissioners in exchange for contracts. During his election campaign, Stodola approached Commissioner Rudy Bartolomei on several occasions and asked Bartolomei where the Commissioners made their money.

Among the contracts that the Commissioners controlled was the contract to clean the Lake County Government Complex in Crown Point, Indiana. The cleaning contract was for about $220,000 annually. Professional Building Maintenance Company was first awarded this contract by bid in 1973 or 1974 and retained the contract through April 1983. Before Stodola was elected, sometime in 1975 or 1976, John Garmon, an officer and part-owner of PBM, had a meeting with the three Lake County Commissioners—at that time, Noah Atterson Spann, Rudy Bartolomei, and Nick Angel. The purpose of the meeting was to inform PBM that it would have to pay the Commissioners kickback money in order to keep the cleaning contract. Subsequently, Bartolomei called Garmon to set up another meeting and told Garmon that "it's time that your company began to make those contributions." At the meeting, Bartolomei suggested that PBM bill the County for paper towels, toilet tissue and hand soap that they would not deliver. Garmon rejected this scheme, and Bartolomei told Garmon, "Devise a way to do it. It's up to you. We have to have it."

After consulting with the other owner of PBM, Harold Mitchell, Garmon did devise a way to pay the kickbacks. PBM would submit invoices to the County for additional work—for example, carpet cleaning, wall washing and other services not included in the general cleaning contract—and inflate the price for the work. The Commissioners would approve the invoices for the extra work, and PBM would receive a check from the County for the inflated amount. After receiving the check from the County, PBM would give the Commissioners the difference between the actual price of the extra work and the amount paid by the County. At another meeting with Bartolomei, Garmon explained this scheme, and Bartolomei approved it. Bartolomei also told Garmon to deliver the kickback money divided equally in three envelopes.

From this time until PBM lost the contract in 1983, Bartolomei would call Garmon two to four times a year and ask him, "Isn't it time for you to come and visit us?"

PBM would then submit an inflated invoice for extra work to the Commissioners for approval. After the Commissioners approved the invoice and the County paid PBM, Mitchell would cash a check for the inflated amount and give the cash to Garmon. Garmon would meet with Bartolomei and give him three envelopes, each containing $1,000 to $2,000 cash.[2] Bartolomei would keep one envelope and give the other envelopes to the other Commissioners. He always told the other Commissioners who the money was from.

PBM was still making payments when Stodola was elected as Lake County Commissioner. Although Stodola never met or talked to Garmon or Mitchell, he did accept and sign PBM's contract proposals for 1981, 1982, and 1983. He also approved and signed inflated invoices for extra work submitted by PBM in October 1981 and February 1982. The inflated invoices led to two bribes, one in November 1981 and another in March 1982. Stodola accepted both bribes. Each time, Bartolomei gave Stodola the envelopes containing the kickback money and told Stodola the money was from PBM.

At trial, both Garmon and Mitchell testified that they believed PBM would lose the cleaning contract if they did not give kickbacks to the Commissioners.

In 1983, PBM did lose the cleaning contract. The Commissioners awarded the contract to General Maintenance Services Company. GMS was formed in 1981 by Larry Crowel and Randy Norris. Crowel had known Stodola for approximately twenty years and had worked on Stodola's campaign for Lake County Commissioner. In late 1981, Crowel had several conversations with Stodola about getting the cleaning contract. Stodola told Crowel that he would have to see Bartolomei. In the beginning of 1982, Stodola suggested to Bartolomei that they give the cleaning contract to GMS; he told Bartolomei that Crowel "knows how to play the game" and "could do a better job" for them.

In 1982, Crowel met with Bartolomei and told him that GMS wanted the cleaning contract. Bartolomei told Crowel that he was not unhappy with PBM. Crowel asked Bartolomei how much PBM was paying him each month, and Bartolomei wrote down $600 or $700 on a piece of paper. Crowel offered Bartolomei $900 to $1000. In a similar meeting with Commissioner Spann, Crowel offered Spann $1000 to $1100 a month. Shortly thereafter, Stodola, Spann and Bartolomei had a secret meeting and decided to award the cleaning contract to GMS.

For the next two years, GMS made monthly payments to the Commissioners. GMS financed the bribes by inflating the annual contract price. Then, after GMS received its monthly check from the County, Crowel would cash the check for the inflated amount and meet with each commissioner in his office to give him the kickback money. Between May 1983 and December 1984, Crowel made seventeen payments of between $400 and $800 to Stodola.

Crowel and his partner, Randy Norris, testified at trial that they paid the Commissioners so GMS could keep the cleaning contract. They both believed that, if they did not pay the kickbacks, GMS would not get the contract.

## II. RICO

Stodola was found guilty of violating 18 U.S.C. § 1962(c). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity...." The enterprise in this case was the Lake County Commissioner's Office. Stodola contends that there was insufficient evidence to prove a "pattern of racketeering activity" under RICO because the jury found him not guilty of conspiracy to commit extortion in regard to the payments from PBM. His acquittal on this count of the indictment, Stodola argues, necessarily implies that the jury found that he did not take bribes from PBM. Thus, the RICO conviction rests only on the seventeen

---

2. On one occasion, Garmon gave the envelopes to Spann.

bribes over twenty months that Stodola took from GMS, and these bribes do not establish a pattern of racketeering activity. Stodola's argument fails for two reasons.

First, his acquittal on the conspiracy to commit extortion count does not necessarily imply that the jury found that Stodola did not receive bribes from PBM. The elements of the predicate acts alleged in the RICO count, violations of the Indiana bribery statute, are different from the elements of conspiracy to commit extortion. Under Indiana Code § 35–44–1–1(a)(2), a public servant who "solicits, accepts, or agrees to accept ... any property, except property he is authorized by law to accept, with intent to control the performance of an act related to his employment or function as a public servant" commits bribery. In Indiana, "it is the soliciting or the receiving of money by an official to influence him with respect to his official duties that is the gravamen of the offense of bribery." *Forszt*, 655 F.2d at 103. In contrast, conspiracy to commit extortion involves knowingly joining a combination or confederation of two or more persons formed for the purpose of committing extortion by their joint efforts. *United States v. Hedman*, 630 F.2d 1184, 1192 (7th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1481, 67 L.Ed.2d 614 (1981).

The only inference that can be drawn from Stodola's acquittal on Count 2 is that the jury found that Stodola did not conspire to extort money from PBM. This does not preclude a finding that Stodola accepted bribes from PBM. Stodola could have accepted bribes from PBM without joining an extortion conspiracy. In fact, the evidence clearly supports a finding that Stodola accepted bribes from PBM. Crowel testified he gave money, in three envelopes, to Bartolomei; Bartolomei testified that he gave Stodola an envelope containing money from PBM on at least two occasions; both Crowel and Mitchell testified that they gave the Commissioners money so that PBM would get and retain the cleaning contract.

Second, even if we do not consider the PBM bribes, the remaining predicate acts independently establish a pattern of racketeering activity. To prove a pattern of racketeering activity, the government need only show "multiple predicates within a single scheme that were related and that amounted to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237, 109 S.Ct. 2893, 2899, 106 L.Ed.2d 195 (1989). Stodola does not question, nor can he, that the government proved multiple predicates within a single scheme that were related. Rather, Stodola contends that the government failed to establish the "continuity" prong of the pattern requirement.

"Continuity," centrally a temporal concept, refers "either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241, 109 S.Ct. at 2902. Closed-ended continuity may be established "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242, 109 S.Ct. at 2902. Continuity was so established in this case where, even discarding the PBM bribes, Stodola received seventeen bribes over a closed-ended period of approximately twenty months. This court has found that such "ongoing bribes of ... public officials, even if pertinent to only a single ongoing service contract, may well establish a 'pattern' for purposes of section 1962(c)." *United States v. Horak*, 833 F.2d 1235, 1240 (7th Cir.1987) (public officials paid $5,000 in periodic payments in exchange for garbage collection contract). *See also, United States v. O'Connor*, 910 F.2d 1466 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 953, 112 L.Ed.2d 1041 (1991) (defendant police officer paid $950 in five installments over two months in exchange for protection and information); *Forszt*, 655 F.2d at 102–03 (Lake County Commissioner received 5% of gross receipts that Gary Office Equipment Company received from Lake County Contracts).

## III. Extortion

Stodola also contends that the evidence was insufficient for a jury to find him guilty of conspiracy to commit extor-

tion as to the payments from GMS, as charged in Count 3 of the indictment. A public official commits extortion under the Hobbs Act if the official obtains property from another, with his consent, through either an actual or threatened fear of economic harm, or conduct under the color of official right. 18 U.S.C. § 1951(b)(2). Extortion by wrongful use of fear of economic harm is established when the public official "acts or wields the powers of office in such a way that it causes a victim to fear some form of retribution if payment of a demanded price is not forthcoming." *United States v. Davis*, 890 F.2d 1373, 1378 (7th Cir.1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990). An official violates the "color of official right" prong of § 1951(b)(2) when he encourages or accepts a payment knowing that it was "prompted by the hope that the official will be influenced in the exercise of his or her powers." *Id.*

### A. Fear of Economic Harm

■ Stodola argues that extortion was not established under the "fear of economic harm" prong of § 1951(b)(2) because GMS's payments to the Commissioners were motivated by hope of illegal financial gain, not fear of economic loss. Stodola relies on *United States v. Garcia*, 907 F.2d 380 (2nd Cir.1990). In *Garcia*, a company made payments to a congressman to induce the congressman to use his influence to help it obtain a government contract. The Second Circuit held that there was no extortion under the economic loss prong because the company was not risking loss of anything to which it was legally entitled. Stodola claims this case is analogous: GMS was not legally entitled to the cleaning contract; rather, GMS offered to make larger illegal payments to the Commissioners than PBM was making in order to take the contract away from PBM.

We need not evaluate the holding in *Garcia* because the case is clearly distinguishable. The Second Circuit reversed a conviction on the "fear of economic loss" provision because the evidence "did not establish that the company acted out of fear that without these payments [to a congressman]

it could lose existing contracts or even opportunities to which it was legally entitled." *Garcia*, 907 F.2d at 385. We have an entirely different situation here. Bartolomei testified that the Commissioners did not award contracts through the bidding process required by law, but rather awarded contracts to the companies that paid them the most kickback money. Both Larry Crowel and Randy Norris, the owners of GMS, testified that they believed that GMS would not get or retain the cleaning contract if they did not pay the monthly kickbacks. In short, GMS would not get the cleaning contract without paying the Commissioners more money than PBM was paying. Viewing the evidence in the light most favorable to the government, a rational trier of fact could conclude that the payments made to the Commissioners by GMS were induced by fear of economic loss.

### B. Color of Official Right

Stodola, relying on *United States v. O'Grady*, 742 F.2d 682 (2nd Cir.1984) and *United States v. Aguon*, 851 F.2d 1158 (9th Cir.1988), argues that extortion was not established under the "color of official right" prong of § 1951(b)(2) because he was merely a passive recipient of unsolicited bribes. Under *O'Grady* and *Aguon*, an affirmative inducement is an essential element of extortion under the color of right. The first flaw in Stodola's argument is that there is sufficient evidence in the record for a reasonable juror to find that Stodola was more than a passive recipient of unsolicited bribes. Prior to his election, Stodola had heard rumors about the Commissioners taking kickbacks, and he asked Bartolomei several times where the Commissioners made their money. Stodola told Crowel that he would have to talk to Bartolomei if he wanted GMS to get the cleaning contract, and he told Bartolomei that Crowel "knew how to play the game" and "could do a better job" for them. Also, Stodola met with the other Commissioners at a secret meeting and agreed to award the cleaning contract to GMS. A reasonable juror could infer from this evidence that

Stodola affirmatively induced payments from GMS.

■ The second flaw in Stodola's argument is that, because the indictment charged conspiracy to commit extortion, the government did not have to prove that the payments from GMS were induced by Stodola. To prove conspiracy to commit extortion, the government was only required to prove that "there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, and that an overt act was committed in furtherance of the agreement by *one* of the coconspirators." *United States v. Tuchow,* 768 F.2d 855, 869 (7th Cir.1985) (emphasis added). "In order to establish an alleged coconspirator's participation in the conspiracy, the government must prove that the alleged coconspirator knew of the conspiracy and that he intended to join and associate himself with its criminal design and purpose." *United States v. Moya–Gomez,* 860 F.2d 706, 758 (7th Cir.1988), *cert. denied,* 492 U.S. 908, 109 S.Ct. 3221, 106 L.Ed.2d 571 (1989). *See also Hedman,* 630 F.2d at 1192. Thus, Stodola's conviction for conspiracy stands if the evidence establishes that he knew of the conspiracy, intended to join it, and some member of the conspiracy induced the payments from GMS. Stodola's many conversations with Bartolomei, his approval of the contract with GMS, and his acceptance of seventeen bribes from GMS demonstrate that he knew of and intended to join the conspiracy. Further, the evidence showed, at the very least, that the GMS payments were induced by Bartolomei and Spann.

3. The Supreme Court granted certiorari in *Evans* to consider whether affirmative inducement is required for extortion under the color of official right prong of § 1951(b)(2). Because we have found that the evidence was sufficient to establish that the bribes from GMS were induced by the Commissioners, Stodola's conviction for conspiracy to commit extortion must still be affirmed even if the Supreme Court reverses *Evans* and holds that affirmative inducement is a necessary element of extortion under the color of official right prong of § 1951(b)(2).

4. The district court instructed the jury that

In any case, this court has rejected the strong inducement requirement of *O'Grady* and *Aguon.* *O'Connor,* 910 F.2d at 1468. In cases involving public officials, "[t]he coercive nature of the official office provides all the inducement necessary." *United States v. Evans,* 910 F.2d 790, 797 (11th Cir.1990), *cert. granted,* —— U.S. ——, 111 S.Ct. 2256, 114 L.Ed.2d 709 (June 3, 1991) (rejecting the strong inducement requirement).[3] "[A] system of payment in exchange for official acts can itself demonstrate inducement." *O'Connor,* 910 F.2d at 1468. Thus, in this circuit, "extortion 'under color of official right' equals the knowing receipt of bribes; they need not be solicited." *United States v. Holzer,* 840 F.2d 1343, 1351 (7th Cir.), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988).

## IV. Jury Instructions

■ Finally, Stodola challenges the district court's instructions on a "pattern of racketeering activity" and extortion. Because Stodola failed to object to these instructions in the district court, we will review the instructions under the plain error standard. *United States v. Medley,* 913 F.2d 1248, 1260 (7th Cir.1990) ("We will reverse for plain error only when otherwise it would be a 'miscarriage of justice.'").

■ Stodola claims that the instruction on the meaning of a "pattern of racketeering activity" was deficient because it discussed only the relationship prong of the pattern requirement and failed to advise the jury of the continuity prong.[4] The jury

As used throughout these instructions a finding of a "pattern of racketeering activity" requires proof of at least two acts of racketeering activity, within ten years of each other, one of which must have occurred after September 29, 1979. The pattern of racketeering activity in which the defendant is alleged to have engaged consists of two or more acts of bribery as that offense is defined under Indiana state law, and as set forth in detail in Count I, paragraph 2 of the indictment.

It is not necessary that the two or more acts be of the same kind or nature so long as you find beyond a reasonable doubt that the acts of racketeering activity occurred within the

should have been instructed on continuity, Stodola argues, because it is an essential element of the crime. This same argument was made and rejected by this court in *United States v. Muskovsky*, 863 F.2d 1319, 1328–30 (7th Cir.1988), *cert. denied*, 489 U.S. 1067, 109 S.Ct. 1345, 103 L.Ed.2d 813 (1989). In *Muskovsky*, we stated that relationship and continuity are not essential elements of a RICO violation; rather, they merely describe an element of the crime—a "pattern." *Id.* at 1329. Thus, although the instruction on a "pattern of racketeering activity" may have been incomplete, failing to explicitly advise the jury regarding continuity "is not the kind of 'miscarriage of justice' which the plain error doctrine is designed to correct." *Id.*

■■■ Stodola's challenges to the extortion instructions are also without merit. The district court set out the statutory definition of "extortion," properly defined "fear" as including fear of economic loss, *Forszt*, 655 F.2d at 104–05, and explained the meaning of extortion "under color of official right" [5] in accordance with well-established Seventh Circuit law, *Hedman*, 630 F.2d at 1194 n. 4. Since the instructions on extortion were fully supported by the statute and case law, we find no plain error.[6]

## V.

For the foregoing reasons, Stodola's conviction is

AFFIRMED.

---

times specified and that each of the acts was connected with the other by some common scheme, plan or motive so as to constitute a pattern.

You must be unanimous in your agreement as to what constitutes the two or more acts.

5. The district court instructed the jury as follows:

Extortion under color of official right means the obtaining of money by a public official through wrongful use of his office when the money obtained was not lawfully due and owing to him or to his office.

It does not matter whether the public official induces the payment to perform his duties or not to perform his duties. Extortion under color of official right does not require proof of acts involving force, threats, or the use of fear so long as the motivation for the payment focuses on the recipient's office.

6. Stodola also contends that his trial counsel's failure to object to the instructions constitutes ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Since the instructions given by the district court comported with the law of this circuit, trial counsel's failure to object was not ineffective assistance of counsel.