**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael MOKOL, Defendant–Appellant.**

No. 90–2681.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 6, 1992.

Decided March 18, 1992.

Rehearing Denied May 13, 1992.

---

Michael A. Thill (argued), Andrew B. Baker, Jr., Asst. U.S. Attys., Dyer, Ind., for plaintiff-appellee.

Martin H. Kinney, William L. Touchette (argued), Merrillville, Ind., for defendant-appellant.

Before BAUER, Chief Judge, CUDAHY and KANNE, Circuit Judges.

BAUER, Chief Judge.

In this appeal, we review the conviction of yet another participant in the web of corruption spun by former Lake County, Indiana Commissioner and Sheriff, Rudy Bartolomei. In a seventeen-day jury trial, Michael Mokol, Chief Deputy of the Lake County Sheriff's Department under Bartolomei, was convicted of racketeering and conspiracy to commit racketeering in violation of 18 U.S.C. §§ 1962(c), 1962(d). He was also convicted of aiding and abetting the operation of an illegal gambling business in violation of 18 U.S.C. § 1955.

Mokol challenges the sufficiency of the evidence supporting the convictions, as well as one of the trial judge's evidentiary rulings. We affirm.

I.

The crimes charged in Mokol's indictment arise out of a gambling operation based upon video poker machines in Lake County, Indiana. Mokol and Bartolomei solicited bribes from poker machine vendors in exchange for police protection. Before he became Sheriff, Bartolomei served as a Lake County Commissioner. In *United States v. Stodola*, 953 F.2d 266 (7th Cir.1992), we considered Bartolomei's participation in a public contract kickback scheme. Bartolomei and the other Commissioners extorted money from businesses that received government cleaning contracts.

Bartolomei was Sheriff from 1983 until 1985. On March 1, 1985, he was charged in a fifteen-count indictment with mail fraud, conspiracy, extortion, and racketeering. Pursuant to a plea agreement, he pleaded guilty and agreed to cooperate with the government's investigation of other Lake

County officials. Bartolomei admitted that while he served as County Commissioner and as Sheriff, he received approximately $20,000 to $30,000 in bribes annually.

During his tenure as County Commissioner and then as Sheriff, Bartolomei maintained a bank account for the Committee to Re-Elect Rudy Bartolomei ("Re-Elect Account"). He was able to force most of his employees to kickback to him two percent of their annual salaries. These funds were deposited in the Re-Elect Account. In addition, Bartolomei received bribes from Lake County citizens in return for special favors. He also held two fund-raising dinners on Valentine's Day in 1983 and 1984. Employees—particularly deputy sheriffs—were expected to sell a certain number of the $100-per-plate tickets. Mokol, who Bartolomei appointed Chief Deputy of the Lake County Sheriff's Department in 1984, told Bartolomei that he could sell $60,000 in tickets for the 1985 fund raiser. Records indicate that Bartolomei received $73,635 from ticket sales in 1985.

Video poker machines became big business in Lake County in 1983. Vendors who provided video games, pinball and vending machines, to restaurants and taverns also provided the video poker machines.

The poker machines began appearing in taverns and restaurants in Lake County in 1983. The machines offered a five-card draw poker game that allowed players to bet "credits" against the machine's hand. For a quarter (which buys one "credit") a player is dealt a five-card hand. The player can discard from one to five cards, and the machine randomly replaces the discarded cards. If the player's hand is better than the machine's, the player wins. Almost all of the businesses with the video poker games "paid out" twenty-five cents per credit to players who beat the machine. The vendor and tavern-owner would split the profits on the machines. Several tavern owners testified that their share of the proceeds was approximately $300 per week, per machine. Mokol does not contest that paying out on the machines constituted illegal gambling. The Racketeering

Influenced and Corrupt Organizations Act ("RICO" or "the Act"), 18 U.S.C. § 1962(c), charges against Mokol and his co-defendant Reginald Kinkade, derive from poker machines owned and rented by Kinkade's sole proprietorship, Variety Amusement Company ("Variety").

Bartolomei's first contact with video poker machine vendors occurred shortly after he became Sheriff in 1983. Don Hackle, who was not charged in these proceedings, contacted Bartolomei through a friend to arrange for protection for his machines. In exchange for $12,000 in bribes, Bartolomei agreed to warn Hackle of any police raids so Hackle could avoid having his machines confiscated. Soon after he received the bribe from Hackle, two of Bartolomei's employees introduced him to another video-machine broker, Richie Garza. Garza told Bartolomei "that a war was going to break out" over video poker districts if "a certain head wasn't appointed." Trial Transcript ("Tr.") at 668.

Bartolomei promoted Mokol shortly after the meetings with Garza. Bartolomei instructed Mokol "to find out who all the vendors were, and then to tell them that if any kind of trouble started or any one was injured ... or war starts ... that we would pull them out and destroy them." Tr. at 670. Mokol identified five vendors with machines in Lake County. Mokol believed that two of the vendors (Garza and Novak) had "violent tendencies" or possible associations with organized crime. Appellant's Br. at 21–22. Mokol began cultivating a relationship with Kinkade, the largest poker-machine vendor.

Timothy Janowsky (a/k/a "Gino"), another vendor, unbeknownst to Mokol and Bartolomei, worked as a confidential informant for the Federal Bureau of Investigation (FBI) from October 1984 through March 1985. The FBI wanted Janowsky to obtain information about video poker machines in Lake County. Initially, the FBI investigation targeted Bartolomei, and two vendors, Kinkade, and Chuck Hescher. The focus of the investigation shifted, however, when Janowsky discovered the relationship between Kinkade, Mokol, and Bar-

tolomei. Janowsky "wore a wire" and recorded many conversations involving Mokol, Kinkade, and Janowsky about the parties' bribes-for-protection arrangement. Unless otherwise indicated, Janowsky taped the conversations recounted below.

Kinkade had video poker machines in approximately seventy-five locations. Kinkade told Janowsky at their first meeting on October 11, 1984, that he had reached an understanding with Chief Deputy Mokol. Garza's and Novak's (the vendors perceived as troublemakers) machines would be raided; Kinkade's and his friends' machines would be moved into the locations opened up by the raids. Another Lake County Deputy, Paul Guernsey, served as a go-between for Mokol and the vendors. Guernsey met Mokol at a restaurant on October 17, 1984. Guernsey told Janowsky that the Lake County police would try to force Garza and Novak out of business. Guernsey arranged with Janowsky for another meeting between Mokol and Kinkade; he explained Mokol was negotiating with Bartolomei to convince him to protect Kinkade and Janowsky and drive out Garza and Novak.

As the negotiations proceeded, three "friendly" vendors, Kinkade, Janowsky, and Hescher, divided the locations that would be available once Garza and Novak were driven out. On November 16, 1984, Kinkade informed Janowsky that he had made a deal with Mokol and Bartolomei. Kinkade agreed that the friendly vendors would pay Mokol $1000 a week for the raids on Garza and Novak, and for protection of their own machines. On November 21, 1984, Mokol confirmed to Janowsky that the Lake County police would protect the friendly vendors in exchange for the money delivered to him for Bartolomei. Mokol also promised to help Janowsky and Kinkade get more locations for their machines. He said all the money would be delivered to Sheriff Bartolomei. Mokol said he needed the support of the vendors because he wanted to run for Sheriff someday.

On December 5, 1984, Kinkade told Janowsky that he had just paid Mokol the first $4,000. Mokol acknowledged receipt of this money in a meeting with Janowsky on December 6. This is the first bribe charged in the superseding indictment. Mokol reiterated that he wanted the vendors to make money, be happy, and help him become Sheriff one day. Mokol promised to get Janowsky some new poker-machine locations.

On January 4, 1985, Kinkade and Janowsky met again. Kinkade said he got another location from Mokol and that he would give him the January payment. Kinkade told Janowsky that if he did not get more help, he would cut down the February payment to $2,000. On February 5, 1985, Mokol came to Janowsky's home for another meeting. Mokol said he had delivered the two payments to Bartolomei, but had promised to sell at least 1,000 tickets for Bartolomei's fund raiser through his people. Mokol said he had not yet sold any tickets.

Mokol informed Janowsky that Bartolomei had turned the entire video poker operation over to Mokol, and that the group only needed to keep paying off the Sheriff. Mokol promised that if he became Sheriff, the vendors would "make a million bucks." Tr. at 2568–69. Mokol explained that each vendor's share of the $4,000 monthly payment was $1,250. He said he had only paid Bartolomei $2,000 of the second $4,000 payment. The indictment charges that Mokol received a second bribe of $4,000 on February 8, 1985.

Later that month, on February 21, 1985, Kinkade, Mokol, and Janowsky met again at Janowsky's home. Mokol promised Janowsky and Kinkade that he would make sure that they got anything they wanted. He also acknowledged that Kinkade purchased a large number of tickets from him for Bartolomei's fund raiser, in addition to the monthly bribe. Mokol promised to protect Janowsky from the Gary police if he purchased tickets for Bartolomei's fund raiser. The indictment charges that Kinkade gave Mokol and Bartolomei a $25,000 bribe on February 28, 1985.

Bartolomei testified that he received two $2,500 payments through Mokol from the poker machine vendors, and a $30,000 cash

payment from Mokol from the "Kinkade group" around February 14, 1985.

Three Lake County tavern owners, Jerome Pisarski, Lowell Richardson, and Chris Serafin, testified that they were visited by police and warned about the video poker machines. Pisarski and Serafin own taverns in Gary, Indiana; Richardson's tavern is in Lake Station. The police told the tavern owners that they could avoid trouble by going with local vendors. Once they replaced their machines with Kinkade and Janowsky machines, the police told them everything was all right.

The government also presented evidence of later bribes from Kinkade and Janowsky to Mokol. Only three were charged in the indictment, however: the two $4,000 "monthly" payments for December and January, and the $25,000 payment in February. The FBI obtained a warrant to search for a hidden compartment and safe at Kinkade's house in Munster, Indiana. The FBI found two calendar sheets in the secret compartment which the government alleges contain a list of Kinkade's bribery payments. There are handwritten lists on the calendar sheets, labeled government's Exhibit 8 ("Ex. 8"), with dates, names or initials, and amounts. Of interest to us are the following notations:

| | | |
|---|---|---|
| 1–2–85 | S | 4000 |
| 2–1–85 | Sh | 2000 |
| 2/28 | S. | 25,000 |
| 3–6 | S. | 2,000 |
| 4/1/85 | S | 5,000 |
| 4–29–85 | S. | 4,000 |
| 5–29–85 | S. | 4,000 |
| 6/30 | Sh. | 1,800 |

We have maintained the vagaries in the notations in our reproduction here. The district court accepted the government's interpretation of the lists on the calendar sheets: that "S" and "Sh." stand for Sheriff (Mokol and Bartolomei), and the numbers are the dollar amounts of the bribes paid. It admitted Ex. 8 to support the government's allegation that Kinkade paid and Mokol solicited bribes. The court also admitted thousands of pages of transcripts of the audio-tape recordings of Janowsky's conversations with Mokol, Kinkade, and the other players.

II.

Mokol argues that his conviction on count one under the Racketeering Influenced and Corrupt Organizations Act ("RICO" or "the Act"), 18 U.S.C. § 1962(c), must be reversed because there was insufficient evidence to find that Mokol was associated with an enterprise as required by § 1962(c), or to prove that he agreed to solicit or accept a bribe.

Mokol also claims that his conviction under count two for conspiracy must be reversed because the government did not establish that he agreed with Kinkade to commit racketeering acts. Mokol challenges his conviction under count three for aiding and abetting the operation of an illegal gambling enterprise in violation of 18 U.S.C. § 1955. He argues that because it was not shown that he was associated with Kinkade's vending company, he could not have aided or abetted the gambling operation.

Finally, Mokol asserts that his conviction and sentence must be vacated because Government Exhibit 8 was improperly admitted and highly prejudicial. He argues that the government failed to authenticate the calendar sheets found in Kinkade's secret room.

A.  State Law Bribery

The racketeering charges against Mokol and Kinkade are based upon violations of state bribery laws, as defined in Indiana Code § 35–44–1–1 (1988). Mokol argues the payments he and Bartolomei received from the poker machine vendors were political contributions, as defined in Indiana Code § 3–4–1–6(a) (1984). Because the illegality of the payments is at the core of the RICO charges, we shall first consider whether or not the government provided sufficient evidence to prove that Mokol and Bartolomei solicited, and Kinkade paid, bribes. "The standard of review in sufficiency of evidence challenges is well established: 'The test is whether, after viewing the evidence in the light most favorable to the government, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'" *United States v. Jewel*, 947 F.2d 224, 231 (7th Cir.1991) (quoting *United States v. Pritchard*, 745 F.2d 1112, 1122 (7th Cir. 1984)).

█ The Indiana Code in effect at the time Kinkade made the payments to Mokol and Bartolomei, defined a political contribution as:

A gift, subscription, loan, advance, or deposit of money or anything of value, made for the purpose of influencing the nomination, or election, of any person to office....

Ind.Code § 3–4–1–6(a) (Repealed by P.L. 5–1986, § 61, effective March 4, 1986). In contrast, a person is guilty of bribery, if he

(1) Confers, offers, or agrees to confer on a public servant, either before or after the public servant becomes appointed, elected, or qualified, any property except property the public servant is authorized by law to accept, with intent to control the performance of an act related to the employment or function of the public servant;

(2) Being a public servant, solicits, accepts, or agrees to accept, either before or after he becomes appointed, elected, or qualified, any property, except property he is authorized by law to accept, with intent to control the performance of an act related to his employment or function as a public servant....

Ind.Code § 35–44–1–1. Thus, we must determine which statute most closely describes the payments made by Kinkade to Mokol.

In *United States v. Forszt*, 655 F.2d 101 (7th Cir.1981), Forszt, a Lake County Commissioner argued that his RICO conviction had to be reversed because the underlying bribery offense had not been proven. Forszt had been indicted for soliciting and receiving (among other payments) a percentage of the gross receipts the Gary Office Equipment Company ("GOE") received from Lake County contracts. Forszt ar-

gued that the government had not proven that the payments from GOE were intended to influence him in his discharge of his official duties. *Forszt*, 655 F.2d at 103. "'[I]n Indiana, it is the soliciting or the receiving of money by an official to influence him with respect to his official duties that is the gravamen of the offense of bribery.'" *Id.* (quoting *Williams v. State*, 188 Ind. 283, 123 N.E. 209 (1919); *Glover v. State*, 109 Ind. 391, 10 N.E. 282 (1887)). *See also Stuckey v. State*, 560 N.E.2d 88, 92 (1990).

Like Mokol, Forszt argued that the payments he received from GOE were political contributions, not bribes. The founder of GOE called the payments "political contributions," but testified that they had always been paid in cash and secreted in newspapers and catalogs. *Forszt*, 655 F.2d at 103. The payments were made in all years, not just election years, and GOE did not support Forszt in any election. Partners in GOE described the payments as "pay-offs" and testified that the money was in return for business from the county and to insure continued business. *Id.* The partners disguised the payments in GOE accounting records, and after the FBI visited GOE, burned the records of all the transactions. Finally, two partners testified that Forszt complained about receiving only two percent of a 1974 contract, when the usual percentage was five percent. *Id.*

In *Forszt*, we held that the jury was entitled to infer from these facts that GOE's payments were made with the intent to influence Forszt's execution of his duties, and were, therefore, bribes. We believe a similar inference is justified in this case. Mokol argues that at least the $30,000[1] payment made by the "Kinkade Group" in February 1985, was for fund raiser tickets. Nevertheless, Bartolomei testified that he believed the poker machine vendors bought tickets so "they would be shown favoritism." Tr. at 771. Bartolomei was asked to explain this comment:

1. Although the indictment alleges a $25,000 bribe, Bartolomei testified that the amount was $30,000. Tr. at 771.

Q. So that they could keep operating their illegal machines, correct?

A. Correct.

Q. Is that the kind of favoritism you would have shown them at the Sheriff's Department?

A. After the fund raiser, probably.

Q. After they had purchased the tickets?

A. Yes.

Tr. at 771–72. Thus, there was ample evidence that the vendors expected, and Bartolomei and Mokol agreed, that the vendors would receive protection and other favors in exchange for the $30,000 payment. In other words, all parties understood the payment would influence the exercise of Bartolomei's and Mokol's duties. Bartolomei also testified that he pocketed the two $2,500 payments brought to him by Mokol, although he gave Mokol $500 of the second payment. Tr. at 776. Although Kinkade gave Mokol two $4,000 payments, Bartolomei only received two $2,500 payments. There is no explanation for the difference between the amounts Mokol received and the amounts he paid over to Bartolomei. The most obvious explanation is that Mokol kept the difference.

Despite Mokol's representation that the monthly payments were for tickets, see Appellant's Br. at 34–35, Kinkade told Janowsky that the group would make the $4,000 monthly payments, and was not obligated to buy the tickets. Transcript of the tape recording of conversation (Tape Tr.), between Janowsky and Kinkade on 11/16/84, Government Ex. 32T at 9, 13–14, 20. Moreover, Mokol told Janowsky that Kinkade gave him money, and in exchange, the police would raid Novak's locations. Tape Tr. of Janowsky and Mokol, 11/21/84, Government Ex. 33T at 17–19. Mokol also confided that his intention was to build up a "kitty" and "reputation", id. at 15, so that he could run for Sheriff once Bartolomei stepped down.

In another taped conversation, Mokol acknowledged receipt of the first payment from Kinkade. Tape Tr. of Mokol and Janowsky, 12/6/84, Government Ex. 24T at 25. Janowsky thanked Mokol for getting a new site for his machines, a tavern called "Bud's Bar"; Mokol promised to get others for him. Id. at 12. This payment according to Kinkade was $4,000. Mokol said he was going to "drop those envelopes" of cash on Bartolomei as soon as Bartolomei returned from a trip. Id. at 71. Ironically, Bartolomei was in Quantico, Virginia, at the FBI Academy getting training to be Sheriff. Tr. at 714–15.

Mokol discouraged Janowsky from making direct payments to Bartolomei—he wanted to act as the middle man so that he could earn Bartolomei's trust. Tape Tr. of Mokol and Janowsky, 12/6/84, Government Ex. 24T at 27. (And perhaps to pocket a share of the payments off the top.) In addition to the monthly payments, Mokol said that the group would have to buy a certain number of tickets after the first of the year to prove to Bartolomei that Mokol "could deliver." Id.

We review sufficiency of the evidence challenges in the light most favorable to the government. Based upon this review, we believe a reasonable jury could conclude that the payments from the Kinkade group were intended to influence Mokol and Bartolomei in the execution of their duties. In the recorded conversations, Mokol promises to raid the competition's machines, and protect the "friendly" vendors. Even if the monies Mokol collected were intended to purchase tickets, all the parties understood that buying tickets also meant buying favors. Therefore, we find that the government proved that Mokol solicited and accepted bribes, as defined by Indiana law.

## B. RICO

### 1. *Mokol's Association with Variety.*

Mokol argues that the government failed to prove that he was associated with Kinkade's Variety Amusement Company, and therefore has failed to satisfy the requirements of RICO. 18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign com-

merce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

In order to be convicted under this section a person must be "employed by or associated with" an enterprise. The government alleges that Mokol was associated with Variety, the enterprise conducting its affairs through racketeering activity (bribery).

■ Association does not require that the defendant be employed by or legitimately connected to the racketeering enterprise. In *United States v. Bright*, 630 F.2d 804, 830 (5th Cir.1980), the court found that a bondsman who paid bribes to the county sheriff to maintain a monopoly in the bail-bond business, was associated with the sheriff's office, the racketeering enterprise. In support of its holding, the *Bright* court cited the Third Circuit's reversal of a case holding that a magistrate accepting bribes from a bonding company was not associated with the bonding-company enterprise. *Id.* (citing *United States v. Forsythe*, 560 F.2d 1127 (3d Cir.1977).

This court considered the meaning of "associated with" in *United States v. Yonan*, 800 F.2d 164 (7th Cir.), *cert. denied*, 479 U.S. 1055, 107 S.Ct. 930, 93 L.Ed.2d 981 (1986). *Yonan* presented facts similar to those considered in *Forsythe*. Yonan was indicted as a result of the Greylord investigation; the enterprise in *Yonan* was the Cook County State's Attorney's Office. *Id.* at 166. Yonan, the defendant, was charged with associating with the Office and conducting its affairs through a pattern of racketeering activity. The activity was seven acts of bribery involving an Assistant State's Attorney. *Id.* at 167. The district court held that Yonan could not be associated with the State's Attorney's Office because he was attempting to undermine the office, and, therefore, had no interest in its goals. *Id.*

We reversed; we found that the statute does not require that a person have a stake or interest in the goals of the enterprise—the statute forbids persons associated with an enterprise from "illicitly conducting or

participating in the conduct of the enterprise's affairs...." *Id.* We explained that in interpreting "association", "a common sense reading of the term that focuses on the business of the enterprise and the relationship of the defendant to that business" is appropriate. *Id.* Thus, we found that Yonan, a criminal defense lawyer, who bribed an Assistant State's Attorney in exchange for favorable treatment of his clients, was associated with the Office as defined in § 1962(c). *See also United States v. Roth*, 860 F.2d 1382, 1390 (7th Cir.1988) (Greylord investigation—person who solicits or accepts bribes for Circuit Court judges is associated with the Circuit Court enterprise).

We based our holding in *Yonan* in part upon *United States v. Lee Stoller Enterprises*, 652 F.2d 1313 (7th Cir.1981), another case involving bribery of a government officer. In *Stoller*, the defendant took money intended for a sheriffs' association, and paid-off the county sheriff in exchange for protection. We found the defendant was associated with the sheriff's office, and conducted or participated in its affairs through a pattern of bribery. *Id.* at 1320–21. The important connection is the one between the defendant and the illegal activities carried on through or by the enterprise. *Yonan*, 800 F.2d at 168. As we pointed out in *Schacht v. Brown*, 711 F.2d 1343, 1360 (7th Cir.1983): "The nature of racketeering connections to an otherwise legitimate business suggests that elements outside a company may assist in obtaining the company's illegal goals."

In a factually analogous case, the Third Circuit held that pension-fund trustees were associated with the mortgage company that bribed them for investments. *United States v. Zauber*, 857 F.2d 137 (3d Cir.1988). The *Zauber* defendants accepted kickbacks from an investment company in exchange for a $20–million investment from the pension fund. The mortgage company was the RICO enterprise that was being conducted through racketeering activity—the kickbacks. *Id.* at 150. The racketeering activity was the payment and receipt of kickbacks in exchange for the

investment. The defendants participated indirectly in the company's business by providing $20 million; the defendants did not have to participate in actual loan transactions between the mortgage company and its borrowers to be associated with the enterprise. *Id.* The pension fund officers made the loans possible by providing the $20 million.

■ Mokol argues that "[t]here was no suggestion at trial that Mokol was associated in any fashion with the legitimate business conducted by Variety." Appellant's Br. at 31. Perhaps Mokol was not connected with Variety's legitimate business—renting jukeboxes, pinball machines, and fussball tables. But the purpose of RICO is to punish an enterprise's illegitimate, or illegal activities. Here, Variety, through its sole proprietor, Kinkade, paid bribes to Mokol and Bartolomei to protect its poker machines and to drive other vendors out of business.

Mokol provided protection from police raids, an essential element in the success of Variety's video poker operation. Mokol argues that the Sheriff's Office's failure to raid the protected locations does not prove there was a bribes-for-protection agreement. Mokol asserts that the Sheriff's Office generally left law enforcement in incorporated areas of Lake County to local city police. Therefore, because most of Kinkade's and Janowsky's machines were located in incorporated areas, the Sheriff's failure to raid these locations means nothing. We are not persuaded. Given (1) the threat of a "war" between vendors over poker-machine territory, (2) the uncontroverted authority of the Sheriff's Office to raid any location, and (3) the testimony of the three tavern owners who were visited by Lake County Sheriff's deputies and warned to deal with the "friendly" vendors, we believe there was ample evidence of a deal between Mokol, Bartolomei, and Kinkade. Mokol's explanation of the general enforcement practices of the Sheriff's Office simply does not overwhelm this evidence.

Again, just because Mokol did not install the machines or collect the proceeds does not mean he did not participate in the conduct of Variety's affairs. As in *Zauber*, (where the essential element provided was capital) Mokol's bribes-for-protection-and-expansion arrangement with Kinkade was sufficient to associate him with Variety. Mokol's association with Variety is the mirror image of the associations alleged in *Yonan, Roth,* and *Forsythe.* The enterprise being conducted through a pattern of racketeering (i.e. bribery) is Variety, and Mokol is assisting the operation by protecting the video poker machines. This association comes within the rubric of § 1962(c).

### 2. *Conspiracy to Commit Racketeering Acts.*

Mokol next argues that his conviction under 18 U.S.C. § 1962(d) must be vacated because he did not agree with Kinkade to commit racketeering acts. In support of this argument, Mokol merely incorporates the arguments he raised in support of his argument under count one (i.e. that there was insufficient evidence to support his RICO conviction for bribery). Appellant's Br. at 37. The thrust of his claim appears to be that because there was insufficient evidence to show that he violated other laws in a context that implicates RICO, he cannot be convicted of conspiring to violate RICO.

Given our holding that Mokol's sufficiency of the evidence claim under count one fails, his argument under the conspiracy count merely incorporating that claim must also fail. Mokol cites *United States v. Neapolitan*, 791 F.2d 489 (7th Cir.1986) for the proposition that "this conspiracy provision only requires that the person agrees to commit two acts of 18 U.S.C. 1962(c) racketeering." Appellant's Br. at 37. Mokol does not argue, however, that he did not commit two acts. He simply reargues that there was insufficient evidence to support the jury's conclusion that he accepted and solicited bribes. *Id.* Because we hold that Mokol committed the substantive offense of bribery and was associated with a racketeering enterprise, we find his challenge to the conspiracy verdict (realleging the same

arguments raised under those counts) is without merit.

### C. Mokol's Conviction for Aiding and Abetting the Operation of an Illegal Gambling Enterprise.

■ Mokol next challenges his conviction under 18 U.S.C. §§ 2, 1955, for aiding and abetting the operation of an illegal gambling business. Section 1955 provides that "whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both." An illegal gambling business is one that violates the law of the state in which it is conducted; "involves five or more persons"; and remains in "substantially continuous operation" for more than thirty days or grosses $2,000 in a single day. § 1955(b)(1)(ii), (iii).

Section 1955 was designed to bolster state law enforcement, especially where, as here, state enforcement is disabled by corruption of state officials. *United States v. Farris,* 624 F.2d 890 (9th Cir.), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 839 (1980). Section two of Chapter eighteen of the United States Code punishes as a principal any person who "aids, abets, counsels, commands, induces or procures" an offense against the United States. To challenge his conviction under this section, Mokol again merely reasserts the arguments made in his challenge to his conviction under count one—i.e. that it was not proven that he was associated with Variety. Because we have held that there was evidence sufficient to support the jury's verdict under count one, we find this claim is also without merit. By agreeing not to raid Kinkade's locations and to obtain additional locations for his video poker machines, Mokol certainly aided and abetted the operation of Kinkade's gambling business.

### D. Mokol's Evidentiary Challenge to Government Exhibit 8.

Mokol argues that his convictions must be vacated because the trial court erroneously admitted Government Exhibit 8 ("Ex. 8"). Mokol contends that Ex. 8, the alleged bribe sheets, were not properly authenticated, and, therefore, not admissible under Federal Rule of Evidence 901. "The admission of evidence generally is left to the sound discretion of the district court, and, therefore, we will reverse the court's decision only for an abuse of that discretion." *Goetz v. Cappelen,* 946 F.2d 511, 515 (7th Cir.1991) (citing *United States v. Byrd,* 771 F.2d 215, 219 (7th Cir.1985)).

The FBI found Ex. 8 during a search of a secret compartment in Kinkade's basement. The compartment contained a safe, as well as two manilla folders in the compartment beside the safe. Tr. at 1155. One folder contained Ex. 8: calendar sheets with a handwritten list of names, initials, and amounts, entitled "pokers." Kinkade's fingerprints were on the folders and the exhibit. Tr. at 2829. At trial, counsel objected to the admission of the papers; he argued that merely obtaining Ex. 8 during the search of the compartment did not establish a sufficient foundation for admitting the documents. Tr. at 1162.

The government argued that the transcripts of the taped conversations between Kinkade and Janowsky authenticated the Exhibit. In these conversations, Kinkade acknowledged making payments to various public officials, including Mokol, Ed Brown in Hammond, and someone named "Charlie" on behalf of a Mr. Vrdoliak in Chicago. The government cited eight separate conversations which discussed payments by Kinkade, which corresponded roughly in amount and date to the figures in the Exhibit. The initials "S." and "Sh." appear to correspond to the payments to Mokol (the sheriff); and "Ed" and "Charlie" to other officials discussed in the taped conversations. Bartolomei testified that he received $30,000 from the Kinkade group around Valentine's Day, 1985. This corroborated the two $4,000, and the $25,000 payments on the bribe sheets. *See* Tr. 2815–2831.

■ The court admitted the statement; it found that it was more likely than not that Ex. 8 was prepared by a coconspirator. Federal Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay, and,

therefore, is admissible, if it is made by a co-conspirator of a party during the course and in furtherance of the conspiracy. In order to admit Ex. 8 under this exception, the district court must have found that the Exhibit was made by Kinkade in the course of his dealings with Mokol.

Federal Rule of Evidence 901 provides that before an item is admitted, evidence sufficient to support a finding that the matter is what its proponent claims, must be submitted. One example of authenticating or identifying information given by the rule is "Distinctive characteristics and the like." FRE 901(b)(4). "Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with the circumstances" may provide a foundation for admitting a document. *Id.*

We considered the admission of records similar to those at issue here in *United States v. de Gudino*, 722 F.2d 1351 (7th Cir.1983). In *de Gudino*, the defendants were indicted for smuggling illegal aliens (so-called "pollos") into the United States. The government seized "pollo lists" from a defendant's house. *Id.* at 1355. The lists consisted of the names of the smuggled aliens, their sponsors, dates, telephone numbers, dollar amounts, and records of payments. Testimony in the case outlined the methods of smuggling and payment used by the defendants. We found this testimony provided "prima facie evidence" that the lists were written by someone involved in the smuggling conspiracy. *Id.* We held that the location of the lists coupled with their substance provided an adequate foundation for their admission. *Id.*

In *de Gudino*, we relied upon *United States v. Wilson*, 532 F.2d 641 (8th Cir.), *cert. denied*, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976). In *Wilson*, the defendants were charged with illegal drug transactions. Notebooks were discovered in an apartment frequented by the defendants. Again, the notebooks were admissible because a foundation was provided by their location and their substance—they revealed the writer was familiar with the defendants' drug operations. *Id.* Similarly, in *United States v. Reyes*, 798 F.2d 380 (10th Cir.1986), the court admitted unsigned, undated handwritten notes seized from the defendant's residence. The notes contained the name of the defendant and initials of his co-conspirators, notations of amounts in ounces, and additions and subtractions of six-digit figures. *Id.* at 383. The court found that admitting the notes was not an abuse of discretion because the information in the notes corresponded to members of the conspiracy, and because they were found in the defendant's residence. *Id.*

■ We believe the handwritten bribe sheets were also properly admitted. Like the notes in *Reyes* they were seized from a defendant's home. Moreover, the information in the sheets, the initials and amounts, corresponded to Mokol and the amounts Kinkade paid him. The information in the sheets also conformed to information Kinkade gave in his recorded conversations with Janowsky. Finally, testimony at trial corroborated information contained in the sheets. Based upon these factors, we believe the exhibit was properly admitted.

### III.

For the foregoing reasons, the judgment of the district court is

Affirmed.